[Civ. No. 558. Third Appellate District.—May 27, 1909.]

## FRANCIS L. HODGKINS, Respondent, v. W. S. DUNHAM, J. M. FLETCHER, and C. R. COLEMAN, Copartners, etc., Appellants.

ACTION FOR DECEIT—ESSENCE OF CAUSE OF ACTION—INTENT TO DECEIVE. The essence of a cause of action for deceit consists in the fact that the false representations were made with intent to deceive, such intent being a necessary element to constitute actual fraud.

ID.—FALSE REPRESENTATIONS UPON PURCHASE OF STALLION—REPRODUCTIVE POTENCY—SUFFICIENCY OF COMPLAINT—IMPLIED INTENT TO DECEIVE.—A complaint in an action for damages, including purchase money paid, for false representations made by defendants upon a purchase from them by plaintiff of a stallion, as to its reproductive potency, as being a sure foal getter, which alleged that such representations "were untrue and were known to defendants to be untrue at the very time when they were made," and that they were made "at the very time of the purchase of said stallion, . . . to induce, and did induce plaintiff to purchase the same . . . relying wholly on the truth thereof," states a cause of action, the intent to deceive being necessarily implied from the averments made, though not expressly alleged.

ID.—INTENT TO DECEIVE INVOLVED IN CONDUCT—LIABILITY FOR DAMAGE. Where A knows that he is stating an untruth "to induce and did induce" B to act to his injury, the intent to deceive is necessarily involved in the conduct of A. One who willfully deceives another with intent to induce him to alter his position to his injury is liable for any damage which he thereby suffers.

ID.—FALSE REPRESENTATIONS MADE OUT OF STATE—TRANSITORY ACTION —APPEARANCE—JURISDICTION OF DEFENDANTS AND OF SUBJECT MATTER.—Notwithstanding the false representations were made out of the state in the residence of the defendants, the action to recover damages therefor is transitory, and may be brought wherever the defendants may be found and where they were sued therefor in this state, and they appeared and demurred, the court acquired jurisdiction of the persons of the defendants and of the subject matter of the action for damages against them for their false representations.

ID.—ATTACHMENT AGAINST DEFENDANTS IMMATERIAL.—The fact that the plaintiff issued an attachment in the first instance against the property of the nonresident defendants is not material, so far as affects the jurisdiction of the court acquired by their appearance in the action, and their demurrer to the complaint for damages for their deceit.

ID.—EFFECT OF VOLUNTARY APPEARANCE.—A defendant appears in an action when he demurs, and his voluntary appearance is equivalent to personal service of the summons and copy of the complaint; and by such appearance the court acquired jurisdiction to render a personal judgment against the defendants, without reference to the property which had been seized by the attachment in the action.

ID.—CHARACTER OF REPRESENTATIONS AS MATTER OF FACT OR OPINION.— Whether false representations or statements are of fact or matter of opinion depends on the circumstances of the case. In reaching a conclusion the court will consider the intelligence and intention of the parties and other facts, in its determination whether the representation was understood as a matter of fact or opinion.

ID.—CREATION OF EXPRESS WARRANTY—QUESTIONS OF FACT.—In order to create an express warranty the word "warrant" need not be used, nor are any particular words necessary. Any affirmation made at the time of the sale as to the quality or condition of the thing sold will be treated as a warranty if it was so intended, and the purchaser bought on the faith of it, and whether it was so intended and the purchaser acted upon it, is a question of fact.

ID.—RESCISSION NOT REQUIRED IN ACTION FOR DECEIT—WRITTEN BILL OF SALE—INDEPENDENT WARRANTY—ORAL EVIDENCE.—The rescission of the purchaser, evidenced by a written bill of sale, is not required in an action of deceit, which is not based upon the writing not expressing the warranty relied upon, which was made at the time of the purchase, that the stallion sold was a sure foal getter. Such warranty was entirely independent of the written bill of sale, and may be proved by oral evidence.

ID.—DECEIT NOT WAIVED—FULL KNOWLEDGE REQUIRED.—Before there can be a waiver of the deceit practiced there must be full knowledge of the deceit. *Held,* that there was no waiver of the deceit practiced in this case.

ID.—ELEMENTS OF DECEIT PROVED.—*Held,* that the evidence sufficiently proved all of the elements of deceit, viz., that the representations were as to material facts; that they were believed by plaintiff to be true; that they were made with intent that they should be acted upon by the plaintiff; that plaintiff acted upon them; and that, in so acting, he was ignorant of their falsity and without means of knowing their truth.

ID.—SUFFICIENCY OF EVIDENCE TO SUPPORT FINDINGS AND JUDGMENT FOR PLAINTIFF.—*Held,* upon a review of the evidence, that it is sufficient to support the findings and judgment for the plaintiff.

ID.—REFUSAL OF CONTINUANCE—DISCRETION NOT ABUSED.—The court did not abuse its discretion in refusing a continuance to take a deposition in rebuttal of plaintiff's testimony, when plaintiff had done nothing to mislead defendants as to his testimony, which was

within the issues, and it appears that one of the defendants who knew the facts was present, and was not called to testify against the plaintiff.

ID.—ADMISSIBILITY OF EVIDENCE—DEPOSITION TAKEN BY DEFENDANTS INTRODUCED BY PLAINTIFF—REFUSAL TO PRODUCE BOOKS.—A deposition taken by the defendants of a witness who kept their accounts and had access to their breeding books, which was not introduced by the defendants, was properly allowed to be introduced by the plaintiff to show that such books were kept, and could have been produced, but that by the advice of defendant's counsel, the witness refused to produce them.

ID.—INFERENCE OF ADVERSE CONTENTS OF BREEDING BOOKS.—Such deposition was admissible for plaintiff to raise an inference that the contents of the breeding books, withheld by the defendants, would be adverse to them if produced, and would corroborate the evidence for the plaintiff.

ID.—OBJECTION BY DEFENDANTS—LIMITATION OF EFFECT OF DEPOSITION —DEFENDANTS NOT PREJUDICED—PRIOR DEMAND FOR BOOKS.—In view of the objections of defendants to the introduction of the deposition, and of the prior demand by plaintiff for the books, before the deposition was resorted to, the limitation by the court of the effect of the deposition, which was introduced as a whole by plaintiff, to the express purpose for which the plaintiff offered it, could not prejudice the defendants, who could have made the entire deposition a part of the record.

ID.—PROOF OF DAMAGES—ACCORDANCE WITH CODE RULES.—*Held,* that plaintiff's proof of damages left little, if any, uncertainty as to the actual damages suffered by the plaintiff, and accorded with the rules laid down in section 3313 of the Civil Code as to the detriment caused by breach of a warranty of the *quality* of personal property, and in section 3314 of the same code, as to the detriment caused by the breach of warranty of the *fitness* of an article of personal property *for a particular purpose,* in which case, besides the detriment included in section 3313, there is also included the loss incurred by an effort in good faith to use it for that purpose.

APPEAL from a judgment of the Superior Court of San Joaquin County.   W. B. Nutter, Judge.

The facts are stated in the opinion of the court.

Arthur C. Huston, and George F. Buck, for Appellants.

Budd & Thompson, for Respondent.

CHIPMAN, P. J.—This is an action to recover the price agreed to be paid for a certain stallion and also damages for alleged fraudulent representations as to the reproductive potency of the horse. The cause was tried by the court without a jury and plaintiff had judgment, from which defendants appeal on bill of exceptions.

In the amended complaint it is averred: That defendants are nonresidents of this state and were copartners whose business was that of "importing and breeding of draft stock and sale of stallions for breeding purposes," and that plaintiff is engaged "in breeding draft and driving stock and breeding stallions to his own brood mares and the brood mares of others for hire"; that plaintiff being "desirous of securing a first-class imported black Percheron stallion, which was a sure foal getter for the head of his stud for breeding to his said mares and for booking to outside mares," so stated to defendants on or about July 25, 1904, "and the defendants then and there stated and represented to the plaintiff that they had an imported black stallion named Joubert, registered No. 40002 (45105) one of the most noted sires that ever left France, and which they were then and there using in stud for their own brood mares, and that he was one of the stallions at the head of their stud, and had been so used by them; that he was a sure foal getter, and offered to sell him to plaintiff for $2500, for the uses so as aforesaid stated by plaintiff to them. That the plaintiff had confidence in the defendants and believed said statements and representations to be true, and relying wholly on the truth thereof he then and there agreed to purchase and did purchase said stallion Joubert from the defendants at the price and for the uses and purposes so stated by him to the defendants as aforesaid. . . . That the said statements and representations were so made by the defendants to plaintiff at the very time of the purchase of said stallion Joubert to induce and did induce plaintiff to purchase the same. That the said statements and representations of the said defendants so made as aforesaid to plaintiff (other than that they then had said stallion Joubert registered No. 40002 (45105), were untrue and were known to the defendants to be untrue at the very time the same were made." It is then averred that plaintiff "bred and rebred his said brood mares to said stallion at the proper time in the season of 1905

and used all proper care in so doing, and gave said Joubert a full and fair trial, but that he failed to get said mares in foal and was during all the times herein mentioned impotent and was of no value as a breeding stallion." It is then averred that by reason of the impotence of said stallion and his failure to get said mares in foal, plaintiff lost the season of 1905 for breeding purposes to said stallion and lost the breeding of said mares during said season, to his damage for the season of 1905 in the sum of $9,500. It is also alleged that for like reason he lost the season of 1906 to his damage in the sum of $4,650. It is also alleged that for like reason he lost the breeding of certain outside mares to his damage in the sum of $700. "That by reason of the failure of said stallion Joubert as a breeding stallion plaintiff was and is further damaged in the amount of the agreed purchase price to wit $2,500.00."

A general and special demurrer to the complaint was overruled and defendants answered denying specifically the material averments of the complaint, and for further answer defendants set forth a bill of sale or contract executed by them to plaintiff at the time of said sale, which it is averred "includes and covers all the transactions between the said plaintiff and the said defendants relative to the sale of the said stallion Joubert," and avers that defendants "have at all times complied with said contract," and "deny that said plaintiff has complied with any of the terms or conditions of said contract." It is further answered that "at all times mentioned in the complaint none of said defendants resided in the state of California and do not now reside therein, and no time has or have resided in said state, but are residents of the state of Illinois, and that all contracts, agreements, representations and warranties relative to the said stallion were made and entered into by and between plaintiff and defendants outside the state of California and that this court has not jurisdiction of the subject matter of the said amended complaint or of the persons of said defendants or either of them."

The bill of sale or contract referred to is as follows:

"KNOW ALL MEN BY THESE PRESENTS, That we, Dunham, Fletcher & Coleman of Wayne, Du Page County, Illinois, have this day sold to Francis I. Hodgkins of Stockton, San Joaquin county, California, the black imported Percheron

stallion JOUBERT 40002 (45105) foaled March 25th, 1889; got by Nesi (42499); Barcelone (42955).

"For extended pedigree see certificate of Registry; for the consideration of twenty-five hundred dollars the receipt whereof is hereby acknowledged.

"In the event that the above named stallion in perfect health, with proper usage, and the mares to him regularly returned and tried or bred, on one full service season's trial does not get with foal fifty per cent of the mares regularly tried and bred to him, then on return of the said stallion to us at Wayne, Du Page County, Illinois, during the first week in the month of April, next following the full service first concluded we agree to furnish the above named purchaser, without further charge, another imported or pure-bred stallion of equal quality, in exchange; but it is expressly provided as a condition of this warrant, that the tally sheet accompanying and delivered with this bill of sale shall be accurately filled out, with date of each service trial, to enable identification of all mares bred, and after being so filled out shall be returned to us at Wayne, Du Page County, Illinois, by registered letter, not later than July 15th, 1905. It is hereby stipulated that a stallion's full service season shall be considered as the period commencing the first day of May and ending the first day of July.

"In the event the conditions of the above agreement are not faithfully performed, or should the above named stallion hereafter become injured or disabled through accident or disease, or should any changes, additions or alterations be made in this bill of sale, not shown by the press copy of same preserved by us, this warranty shall be null and void and of no effect and all obligations incurred by us herein shall be considered fulfilled and ended.

"This Bill of Sale contains all the agreements of warranty or guaranty made by us in the sale of the above mentioned stallion, and it is expressly provided that we shall not be liable for any claim that may hereafter be made alleging any verbal agreement of ourselves or agents in the sale of said horse.

"IN WITNESS WHEREOF, we have hereto set our hand and seal this twenty-fifth day of July in the year of our Lord, nineteen hundred and four.

"(Signed)  DUNHAM, FLETCHER & COLEMAN.

"(Seal)"

This bill of sale was delivered to plaintiff at the time of said purchase for which the following receipt was given: ''Received and accepted of Dunham, Fletcher & Coleman of Wayne, Du Page County, Illinois, their written bill of sale to Francis I. Hodgkins of Stockton, San Joaquin County, California, dated July 25th, 1904, and conveying the title to the black imported Percheron stallion Joubert. . . . Dated Wayne, July 25th, 1904. Francis I. Hodgkins.''

The court found the facts substantially as set forth in the complaint and made also the following findings:

''VII. That by reason of the failure of said stallion Joubert to get said brood mares in foal, the plaintiff lost the season of 1905 for breeding purposes to said stallion, to his damage $1625.00.

''VIII. That plaintiff by reason of the failure of said stallion Joubert as a breeding stallion, was further damaged in the sum of $2500, the agreed purchase price for said stallion.

''IX. That said stallion Joubert while in the possession of plaintiff and on or about the month of June, 1906, died.''

It was also found that plaintiff did not offer to return the said stallion to defendants, and that it is not true that no statements or representations and warranties relative to said stallion, other than contained in said bill of sale, were made by defendants to plaintiff.

It appeared in evidence and was not disputed that on May 20, 1905, plaintiff wrote to defendants the following letter:

''Dear Sirs: In regard to Joubert I want to know if you are going to hold me exactly to your guarantee. There is one clause in there which reads: 'It is hereby stipulated that a stallion's full service season shall be considered as the period commencing the first day of May and ending the first day of July.' The season out here commences the first of March and practically ends the middle of June. Now I don't want to lose the use of my mares entirely for this year and if I have to keep breeding Joubert it will mean that I will, because every mare that I have bred has come back to him twice and three times and I have bred to over forty mares. Most of these mares have colts at their sides so that I know they are producing mares.

''Please wire an answer to this at my expense so that I can begin to breed my mares to another horse or I will lose next

year's crop of colts as Joubert has not got one mare in foal yet, and he has had as fair a trial as possible for any horse to have.

"I have not had any kicks yet from any of the horses I have sold except one and I think he is doing all right now.

"Please wire me an answer to Stockton and oblige

"Yours truly

"FRANCIS I. HODGKINS."

And on May 26th, 1905, received the following telegram from defendants:

"You may change Joubert mares after second service."

Defendants wrote plaintiff in reply on May 26, 1905, as follows:

"Dear Sir: Yours of May 20th regarding Joubert is received. We do not wish to be unreasonable in the matter and yet at the same time we are anxious of course that Joubert should have the fairest of trials and have no doubt you are also. So we have wired you and now confirm. 'You may change Joubert mares after second service.' As we understand it you have bred practically all of his mares the second time so this will allow you to make the change you wish to another horse."

Upon this evidence the court found "that it is not true that on or about May 20, 1905, or at any time, with full knowledge of the facts, the said plaintiff applied to defendants for a modification of said contract permitting plaintiff to breed to any stallion certain mares that had been bred to said stallion Joubert."

It was also found that none of the defendants resided in this state but were and are residents of the state of Illinois; that the agreements and representations in the findings mentioned, relative to said stallion, were made outside of this state, "but the said stallion was sold to plaintiff by defendants to be used by him in the state of California, and that the representations made by defendants were so made with that fact in mind; that the records and files in this action show that an attachment was issued in this action and a levy made upon personal property of defendants in this state, but that the same was released by the sheriff of Yolo County and the sheriff of San Joaquin County upon bonds duly executed for such release at request of defendants." Plaintiff had judgment accordingly for $4,125.

1. It is claimed by defendants that the complaint does not state a cause of action. The point here relied upon is that there is a failure to allege that the statements and representations attributed to defendants were made by them with intent to deceive or defraud plaintiff. (Citing *Newman* v. *Smith,* 77 Cal. 26, [18 Pac. 791]; *Feeney* v. *Howard,* 79 Cal. 525, [12 Am. St. Rep. 162, 21 Pac. 984]; *Estate of Benton,* 131 Cal. 478, [63 Pac. 775].) Without doubt the essence of a cause of action for deceit consists in the fact that false representations were made with intent to deceive, such intent being a necessary element to constitute actual fraud. The averments here, it seems to us, meet the requirements of the law. It is averred that the representations made by defendants "were untrue and were known to the defendants to be untrue and the very time the same were made"; that "the said statements were so made by defendants to plaintiff at the very time of the purchase of said stallion Joubert to induce and did induce plaintiff to purchase the same"; and that "plaintiff had confidence in the defendants and believed said statements and representations to be true and relying wholly on the truth thereof he then and there agreed to purchase," etc. Plaintiff had previously averred in the complaint the purpose for which he desired the horse and the representations made by defendants showing that the horse was adapted to that purpose and would meet plaintiff's requirements, among which was the material qualification that the horse "was a sure foal getter." It is true that the word "intent" is not used in the pleading, but the intent is implied or may well be inferred from the allegations that defendants made untrue statements which they knew to be untrue for the purpose at the time they were made of inducing plaintiff to purchase the horse. Section 1572 of the Civil Code declares that actual fraud "consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; 2. The positive assertion in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true." Where A knows that he is stating an untruth "to induce and

did induce" B to act to his injury, the intent to deceive is necessarily involved in the conduct of A. Section 1709 of the Civil Code provides that—"One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." It was said in *Newman* v. *Smith*, 77 Cal. 26, [18 Pac. 791], cited by defendants: "It is elementary that fraudulent misrepresentation as to a material matter, by which a party was induced to enter into a contract to his damage, is ground for an action at law or relief in equity, notwithstanding that the contract was in writing and the representations were not."

What has been said upon this point will dispose of the objection that the findings are insufficient, for they are quite as specific in the respects complained of as is the complaint.

2. It is contended that under the admitted facts the court was without jurisdiction either of the persons of defendants or the subject matter of the action. The court found that the defendants are nonresidents of this state and that the representations complained of were made in the state of defendants' residence, to wit, Illinois; that an attachment was issued in this action and personal property of the defendants levied upon under the same in this state, but that it was released by the sheriff "upon bonds duly executed for such release at request of said defendants." It is conceded by plaintiff that upon the complaint and attachment alone the case was in its nature *in rem*, "and the jurisdiction (other than of the subject matter) depended upon and was limited to what the plaintiff had acquired by such attachment." By an attachment where there is no service of summons the court simply acquires the right to apply the property to the satisfaction of whatever may be found due the plaintiff; that is, the judgment of the court, though in form a personal judgment against the defendant has no effect beyond the property attached in the suit; and the court, in such a suit, cannot proceed unless the officer finds some property of defendant on which to levy the writ of attachment. (*Cooper* v. *Reynolds*, 10 Wall. 317; Works on Jurisdiction, p. 48.)

Defendants devoted much attention to the point that the attachment was void, not being authorized by section 537 of the Code of Civil Procedure as amended in 1905, and hence

the court was without jurisdiction. The proceedings are not in the record. All that we know is shown in the findings. We do not understand that plaintiff claims jurisdiction by virtue of his attachment. Nor is it necessary that he should. The action is transitory as distinguished from what are local actions. The distinction, says Mr. Cooley, is this: "If the cause of action is one that might have arisen anywhere, then it is transitory; but if it could only have arisen in one place, then it is local." And, says this author, "It is a general rule that for the purpose of redress it is immaterial where a wrong was committed; in other words, a wrong being personal, redress may be sought for it wherever the wrongdoer may be found." (Cooley on Torts, 3d ed., p. 899.) Where the action is for fraud he cites *McQueen* v. *New*, 87 Hun, 206, [33 N. Y. Supp. 802]. Mr. Works says: "If the defendant is personally served within the state, although a nonresident, and only temporarily, or transiently therein, this gives the court full jurisdiction." (Works on Jurisdiction, p. 48, citing *Peabody* v. *Hamilton*, 106 Mass. 220.)

In *Roberts* v. *Dunsmuir*, 75 Cal. 203, [16 Pac. 782], a British subject brought suit against other British subjects in this state to recover damages for injuries received while employed by them in their coal mines in British Columbia. The court said: "The action is transitory and the defendant may be sued wherever found. Otherwise a person might in some cases escape such liability by simply going to another state."

Defendants demurred to the complaint generally and also upon other grounds, including want of jurisdiction. A defendant appears in an action when he demurs. (Code Civ. Proc., sec. 1014.) The voluntary appearance of a defendant is equivalent to personal service of the summons and copy of the complaint. (Code Civ. Proc., sec. 416.) The court, therefore, acquired jurisdiction of the persons of defendants and also jurisdiction to render a personal judgment without reference to the property which had been seized by attachment.

3. It is urged that the evidence is insufficient to establish a cause of action.

It appeared from the evidence that plaintiff was in 1904, as he had been in previous years, engaged in breeding fine horses, Percherons and others, and had been a valuable customer of defendants. In the spring of 1904 Mr. Coleman,

one of the defendants, visited plaintiff's farm near Stockton and was told by plaintiff that he desired to purchase the best Percheron stallion for breeding purposes that he could buy. Coleman represented to him that he had a stallion recently imported from France called Joubert whose colts defendant Fletcher said he had seen in France and were the best he ever saw.

Plaintiff had received a catalogue from defendants describing this among other thoroughbred horses and mares on sale at their Oaklawn stock farm in Illinois. This catalogue gave Joubert high praise as a superior stallion. Two or three months after this conversation plaintiff visited defendants' farm to make purchases, arriving about July 15, 1904, and there met defendants Dunham and Coleman. Plaintiff testified: "The first conversation I can remember having with Mr. Dunham took place in his private house, and during that conversation I asked him if Joubert was proving a sure foal getter, and whether he was getting his mares in foal properly; he said yes. I then asked him about how many mares Joubert had been bred to; he said about 40 to the best of his knowledge, but that Billy Burns had a list and could tell me all about them. Burns at the time had charge of Joubert." Four or five days later plaintiff saw Burns: "I asked Mr. Burns if Joubert was a sure horse; Mr. Burns told me he considered Joubert to be as sure a foal getter as he had ever had in his barn except Villiers. This was in July; and Joubert was in service upon the farm of Dunham, Fletcher & Coleman in Illinois at that time. I saw him bred to a mare there. That was after I had the conversation with Dunham." Plaintiff was on the farm about ten days in all "looking at mares and stallions." After his conversation with Dunham he had a conversation with Coleman in which he said to Coleman: "I didn't care particularly about a show horse, but that I did want a sure breeder. I further told him that he knew what I wanted the horse for; he then advised me, or he told me, that if he was in my place he would buy Joubert, that Mr. Fletcher had seen his colts in France and considered them a fine lot of colts, and that I wasn't taking any chances on Joubert, and that Mr. Dunham—and he thought Mr. Dunham was a damn fool for selling him." Plaintiff testified that he had not up to this time made up his

mind to buy Joubert; that he knew nothing concerning the horse's power of procreation except as obtained from these people; that he was depending upon their judgment; that he would not have purchased the horse had it not been for the statements of these people to which he testified and that the horse had no value for any purpose other than breeding. Plaintiff testified that the purchase was concluded the day of or the next after his last conversation with Coleman and the price was fixed at $2,500. The horse was taken to plaintiff's farm in August of that year. He was in good condition on his arrival and thenceforward received such care and attention as was ordinarily given to a horse of his character and value. In December of 1904 he was taken ill with pneumonia and was seriously sick for a week or more but recovered upon proper treatment in about six weeks and entered the season in March, 1905, in good health and vigor. The breeding season begins in March and ends about July 1st. The evidence is that Joubert was bred to thirty-one mares belonging to plaintiff and thirty-two "outside mares"; that the usual care given a stallion during such service—as to feed, exercise, etc.—was given this horse and usual efforts to get mares with foal—such as return service when failing at first, were made, sometimes mares being returned two or three or more times. The result of the season was that of plaintiff's mares but one was in foal and of the others one or two only. There was evidence that the mares were breeders, some having sucking colts by their sides. There is evidence, from which the inference could be drawn that the failure of the horse could not be attributed to any cause other than his impotency. It was in evidence that Dunham visited plaintiff's ranch and saw Joubert in April, 1905, during the breeding season, but did not inform plaintiff of the result of his, Dunham's, breeding and did not tell him that of the forty mares bred by him only two were got with foal. About a month after the close of the season Joubert was attacked with a disease which developed into what was pronounced by veterinary surgeons to be spinal meningitis; he found difficulty in getting up when once down and his locomotion was affected. In August Fletcher visited plaintiff's ranch and saw the horse and something was said as to how the horse was to be disposed of. Plaintiff testified: "Q. Did he say anything to you at that

time with respect to what you should do with this horse? A. He said I could probably sell him for a certain amount of money enough so to pull even. Q. What did you say? A. I said I couldn't and wouldn't sell him. Q. Was anything said at that time as to the return of this horse? A. Yes. Q. What did you say? A. In the course of the conversation I told Mr. Fletcher that if I was to return him they wouldn't accept him on account of the condition he was then in. Q. What did he say? A. He says no that they couldn't accept him." Witness was asked if he had further conversation with Fletcher as to the horse at this time and what Fletcher said: "I asked Mr. Fletcher if Joubert had proved a satisfactory breeder for Mr. Dunham; he said 'No, I don't think so.' I then asked him if it was true that Joubert had only gotten two colts for Mr. Dunham; he said yes. I then told him that they couldn't have helped but known that the horse was no good at the time they sold him to me; and he didn't say anything."

Joubert did not recover from this second illness; the disease progressed slowly notwithstanding the efforts made to restore him to health and he died in June, 1906. As tending to show impotency in the horse it appeared that a stallion of sufficient age in good condition could safely serve sixty to seventy-five mares each season; that he should get in foal about sixty per cent of the mares bred to him, of which about ninety per cent are dropped alive and healthy. It also appeared from the evidence that almost invariably when a mare has "caught" or is impregnated she will not demand or submit to a second service; and, if she returns, it is the experience of experts that she is not in foal. It is thus known during the season whether or not the horse is incapable of procreation. Defendants seem to have had knowledge on this point, for they authorized plaintiff to change the stallion after the second service. There was evidence that Joubert was foaled in March, 1899, and his former owner, in France, Mr. Perriott, bred him to seventy-five mares in 1902 and to sixty-five in 1903, and that he got fifty-one colts the first season and forty-three the second. It also appeared by the uncontradicted testimony of an expert that such early breeding would almost certainly destroy the horse's potency; and it appeared that in the two seasons following—one under defendants' management

and the other under plaintiff's—the horse showed unmistakable loss of procreative virility.

Opposed to this testimony and in conflict with it to some extent the deposition of Mr. Fletcher was introduced by defendants; Mr. Coleman was a witness at the trial; Mr. Dunham was present but was not called as a witness and left before the trial closed. Fletcher testified that he was not personally present, although he was at the Oaklawn farm, when plaintiff purchased Joubert; that he made no representations to him about the horse until after the purchase and then only as to what he learned about him from Mr. Perriott; that he had no knowledge other than through that source as to Joubert's breeding qualities, and that he believed him to be all right in that particular and did not know to the contrary; that he did not know and had no reason to believe that the horse was impotent. Mr. Coleman testified that he and Fletcher were not interested in breeding and that the mares were owned by Dunham; that he and Fletcher were interested only in the importation of stallions with Dunham; but he knew that Dunham was using them for breeding; that Fletcher bought Joubert in France after having investigated his history and reported him to be a sure breeder and "a grand breeding horse" with a fine pedigree; that he met plaintiff at his ranch in California in June, 1904, and told him what Fletcher had said of the horse. His testimony as to what took place the day plaintiff came to the Oaklawn farm is brief and to the effect that after a few minutes talk at the office he and Dunham went with plaintiff to the barns and had Joubert led out by Burns with another stallion called Bosquet; that he looked the horses over carefully "probably fifteen minutes, and he came around to me and he says 'Joubert is good enough for me; I will take Joubert.'" He testified that he said nothing to plaintiff about the horse, except as to some blemish of the hocks, that he gave him no advice and made no representations then or at any time about his being a sure breeder; denied all knowledge on that point except as told him by Fletcher, although he said he understood he had been bred to six mares and had gotten three with foal; that plaintiff was there several days and nothing more was said about Joubert until July 25th when they came to settle up and plaintiff took the bill of sale signing a receipt therefor; that plaintiff used

his own judgment and did not act on his, Coleman's, advice or judgment.

It appeared that the deposition of one Vandervere, who had charge of the accounts and books of the firm and had access to the breeding book, was taken by defendants but was not introduced by them at the trial. The court, over the objection of defendants, allowed plaintiff to introduce this deposition for the sole purpose of showing that breeding books were kept and could be produced but that on the advice of defendants' counsel the witness refused to produce them. The inference sought to be drawn from this fact was that this record would have shown how many mares were bred to Joubert by defendants and the evidence would have been unfavorable to defendants and would have tended to corroborate plaintiff's testimony as well as to dispute that of defendants.

It seems to us that the evidence justified the findings of the court. It is strongly urged by defendants that the most that can be made out of the representations of defendants is that they were but expressions of opinion and were so received by plaintiff. Cases are cited holding that misstatements of matters of opinion do not constitute fraud; that expressions of opinion, however erroneous, if honestly made, will not be regarded as fraud. *Wainscott* v. *Occidental Assn.*, 98 Cal. 258, [33 Pac. 88], is cited, wherein the rules applicable to cases of this character are said to be succinctly stated, as quoted from the opinion in *Southern Development Co.* v. *Silva*, 125 U. S. 250, [8 Sup. Ct. 882] ; and it is there stated that "these rules, properly construed, exclude such statements as consist merely of expressions of opinion or judgment honestly entertained." And as was said in *Reeves* v. *Corning*, 51 Fed. 774, cited by defendants: "Whether false representations or statements are fact or matters of opinion depends upon the circumstances of each case. In reaching a conclusion the court will consider the intelligence, the situation of the parties, the general intelligence and experience of people as to the nature and use of the property, the habits and methods of those dealing in or with it, and then determine whether the representation was understood as a matter of fact or opinion." It was said in *McLennan* v. *Ohmen*, 75 Cal. 558, [17 Pac. 687] : "To create an express warranty the word 'warrant' need not be used, nor are any particular words necessary. Any affirmation made

10 Cal. App.—45

at the time of the sale as to the quality or condition of the
thing sold will be treated as a warranty, if it was so intended,
and the purchaser bought in the faith of such affirmation; and
whether it was so intended, and the purchaser acted upon it,
are questions of fact for the jury.'' In the light of these
rules let us consider the elements necessary to constitute fraud
or deceit and the evidence in the case.

(1) That the representations made were as to material facts
is abundantly shown. The single fact alone, that the horse
was represented to be a sure foal getter covers this require-
ment. (2) That the representation was untrue is established
by the evidence that in 1904, bred to forty mares by defend-
ants, the horse got but two with foal and of sixty-three mares
bred to the horse by plaintiff, in 1905, but three proved in
foal. According to the uncontradicted testimony no surer
test could be given of the horse's sterility. (3) Were the
representations actually believed by defendants on reasonable
grounds to be true? If so, the rule exonerates them. Assum-
ing that the horse was virile when he came from France and
that his history there was believed by defendants to be as Mr.
Perriott represented, the evidence is that when they made the
representations to plaintiff the season was about concluded;
forty mares had been bred to Joubert and only two were
with foal. As breeders and dealers in breeding horses and
mares of long and wide experience, it must be presumed that
they knew, what witnesses stated was well known to breeders,
that these mares were not being got with foal. Plaintiff was
referred by defendants to Burns, who had charge of the horse,
and was by him assured of the fact uppermost in plaintiff's
mind—that Joubert was a sure foal getter, and yet Burns'
position must have shown him that the statement was untrue
and that he had no reasonable grounds to believe it to be true.
The silence of Fletcher when confronted with the fact later
lends support to this view. (4) That these representations
were made with intent that they should be acted upon by
plaintiff, it seems to us must follow from the knowledge of
the fact on the part of defendants and their withholding that
knowledge when making the representations. We can con-
ceive of no other intention in the minds of defendants than
that plaintiff should act upon their statements. (5) That
plaintiff acted upon these representations clearly appeared;
and (6) That in so acting he was ignorant of their falsity and

reasonably believed them to be true. He had no means at the time of knowing the truth except as he got it from defendants and his former dealings with defendants justified him in believing what they told him and acting upon it.

These are the six elements relied on by defendants as necessary to be established, and we. think they have been. It is urged by defendants as peculiar that plaintiff said nothing to Dunham in April, 1905, when he visited plaintiff's ranch, about any misrepresentation, and that this fact, together with his having written the letter of May 20, 1905, shows conduct incompatible with any claim of fraud. In April the season had but just begun, and it was too soon to form an opinion as to the capacity of the horse. By May 20th his incapacity had shown itself, but not necessarily that plaintiff had been willfully deceived by defendants. It was not until August—after the close of the season and when Fletcher told plaintiff of facts not hitherto known to plaintiff—that the fact of defendants' fraudulent misrepresentations was brought home to him. We cannot regard this letter of May 20th as a waiver of the fraud as claimed by defendants, for the reason that when it was written plaintiff had no sufficient knowledge to warrant such a charge. He cannot be presumed to have waived a fact of which he was not as yet informed. He simply said that he had gone far enough to learn that he would lose the use of his mares for the season if obliged to continue the vain thing of breeding Joubert longer. Defendants' answer is a concession that plaintiff had done all that could be required of him and authorized him to "change Joubert mares after second service." Up to this time, as we have seen, and until August following, plaintiff was ignorant of the material fact that Joubert had proved sterile in 1904.

4. It is defendants' further contention that in bringing his action for damages for fraud plaintiff affirmed the contract of sale and is bound by its terms. The position taken by defendants is that if plaintiff intended to repudiate the contract and not rely upon its provisions as furnishing him a remedy for the failure of Joubert to meet the requirements of the contract, plaintiff was in duty bound to rescind. Instead of doing this, it is contended that he elected to affirm the contract and retain the property and cannot therefore escape the burdens and limitations imposed upon him by the writing. (Citing 15 Cyc. 252; Bigelow on Frauds, p. 65;

*Montgomery* v. *McLaury,* 143 Cal. 87, [76 Pac. 964] ; *Schmidt* v. *Messmer,* 116 Cal. 267, [48 Pac. 54], and other cases.) We do not regard this case as falling within the rules of the cases cited. The action is not for breach of the contract, nor is it for any warranty express or implied as found in it. The contract contains no express warranty that the horse was a sure foal getter. The promise there made is to furnish plaintiff a horse of equal quality (whatever that means) in case of failure. The action is for fraudulent representations made at the time of the purchase against which no provision was made in the bill of sale. Up to May 20th, and to July, when he returned to defendants the tally sheet of mares bred—indeed, until in August, 1905, plaintiff seems to have been disposed to look to the contract, and on May 20th he communicated the facts so far as disclosed to him. He then had reason to believe that the horse was a failure and that the representations made to him were untrue, but he had no reason for believing that they were known by defendants to be untrue or were made with intention to deceive. There must be full knowledge before there could be a waiver. The friendly relations long existing between the parties and their former business dealings would make plaintiff slow to attribute fraud to defendants. But in August the truth came out. Plaintiff charged the fraud promptly and a suggestion that the horse be taken back was as promptly refused by Fletcher while remaining silent as to the charge of fraud. The fraudulent representations upon which plaintiff bases his action are entirely independent of the contract. "Fraud vitiates all transactions, and cannot be put beyond the reach of the law by so simple a device as a writing." (*Newman* v. *Smith,* 77 Cal. 26, [18 Pac. 791].)

When the party imposed upon elects to rescind he must make restoration of the property, but where he elects, as he may do, to affirm the transaction and sue for damages, no offer to restore what was received is necessary. (8 Am. & Eng. Ency. of Pl. & Pr., p. 895.) He is not restricted to his right to rescind his contract of sale on discovery of the fraud practiced upon him, but may bring assumpsit for money had and received (*Lord* v. *French,* 61 Me. 420) ; or he may have other remedies (*Edwards* v. *Owen,* 15 Ohio, 503; *Meeker* v. *Potter,* 5 N. J. L. *586). A party may remain silent after discovery of the fraud and affirm the contract with knowledge

of such fraud, as this can only extinguish the right to rescind, leaving his other remedies unimpaired; and by bringing an ac- tion for deceit before he has complied with the terms of the contract on his part, he merely restricts the extent of any recovery which might be authorized.   (*Weaver* v. *Shriner,* 79 Md. 530, [30 Atl. 189] ; *Groff* v. *Hansel,* 33 Md. 166.)   The action here is not for rescission, nor is it for breach of con- tract, but is for the deceit practiced to induce its execution. The following cases will illustrate the one here with clearness.

In *Dixon* v. *Barclay,* 22 Ala. 370, a bill of sale was given for a slave.   At the time the contract was executed it was agreed by the vendee that he would remove the slave from the state, and this it was claimed was part of the consideration entering into the price.   The action was by the vendor for deceit and fraud in making with plaintiff a contract which, at the time he made it, the defendant did not intend to keep.   The court allowed parol proof of the fraud, although it contradicted the bill of sale set out in the complaint, the *gravamen* of the ac- tion being the fraud and deceit.   Similarly held in *Plant* v. *Condit,* 22 Ark. 454.

In the case of *Inge* v. *Bond,* 10 N. C. 101, the action was for deceit in the sale of an unsound negro.   A bill of sale had been given containing no warranty of soundness, defendant expressly refusing to sign a bill of sale containing such war- ranty.   The court said: ''The affirmation, as stated in the declaration, is not laid in the way of a contract, the breach of which has brought damage to plaintiff, but as a deceit prac- ticed upon him, whereby he was induced to make the con- tract. . . . If there is any fraud in the case, that cannot be done away by the contract, and the buyer may, notwithstand- ing, bring his action on the case, which is the only one that could be brought in this case,'' the slave having died.

In *Antle* v. *Sexton,* 137 Ill. 410, [27 N. E. 691], the action was on the case, to recover damages for fraud and deceit in the sale of timber standing on the land of one Jameson.   The subjects of the sale included timber land.   The ground of fraud was the representation that the tract of timber contained eighty acres when in fact the contract conveyed only thirty acres.   The court said: ''The action was not brought upon the contract, but upon false representations and deceit, used to induce the plaintiffs to enter into the contract, whereby they have been damaged.   It is well settled that such an action will

lie though the parties may have entered into a written agree-ment, and though in such agreement there may be a warranty or stipulation upon the point covered by the misrepresenta-tions.'' (Citing 2 Addison on Torts, 1004; 1 Chitty's Plead-ing, 137, note 4; Hilliard on Torts, secs. 4, 5, 12; *Ward* v. *Wiman,* 17 Wend. 193.) ''And so it will lie if in the written contract there is no reference to the subject of the deceitful statements.'' . . . ''The fraud is not merged nor extinguished by the covenant, but affords an additional and more complete remedy.''

5. Error is assigned for denying defendants' motion for a continuance of the case to take Fletcher's deposition to ob-tain his version of the conversation related by plaintiff as hav-ing occurred in 1905. The ground of this motion was that plaintiff's testimony was a surprise and could be met only by Fletcher, whose business engagements forbade his being pres-ent. We cannot see that plaintiff had by anything said or done by him misled defendants as to what he would testify to. The essential fact to be known was whether Dunham did breed forty mares to Joubert and the result. Dunham, who knew the facts, was present but was not sworn. The situation was one in which the granting of the motion was peculiarly within the discretion of the court. The showing made is far from convincing us that the court abused this discretion.

6. Error is claimed in admitting the deposition of Van-dervere for the purpose to which the court limited it. It may be that had the court refused to allow defendants' request that all or none of the deposition be read, it would have been error. A party may not introduce selected portions of the deposition of his own witness upon direct examination, omit-ting the rest of the deposition. (*Bank of Orland* v. *Finnell,* 133 Cal. 475, [65 Pac. 976].) Here the entire deposition was admitted, but because of defendants' objection it was limited in its use by the court to the fact desired to be shown by plain-tiff. Defendants could have made the entire deposition part of the record had they been so minded, but they did not want this and were, therefore, not prejudiced by the limit given the deposition by the court. The fact shown, as already pointed out, was material as showing that breeding books were kept by defendants and that they refused to produce them. The de-mand to produce the books was made by plaintiff before re-

sorting to the Vandervere deposition. We see no error in the ruling.

7. There was much testimony introduced by plaintiff, over defendant's objection, for the purpose of showing damages. Evidence of the value of colts, thoroughbred and graded, when foaled; also when weaned at six months; the value of the breeding season; the money loss in failure of the horse resulting in the failure of the mares to have colts. It is claimed that the evidence was remote and the damages speculative, conjectural and uncertain; that plaintiff is not entitled to recover profits which he might have made had he not been deceived. The evidence left little, if any, uncertainty as to the actual damages sustained. Whatever may be the rule elsewhere, we understand our Civil Code, sections 3313 and 3314 to establish the rule in this state. The rule contended for by defendants is that laid down in section 3313, which relates to "the detriment caused by the breach of a warranty of the *quality* of personal property," etc. Section 3314 relates to "the detriment caused by the breach of a warranty of the *fitness* of an article of personal property for a particular purpose," in which case the detriment "is deemed to be that defined by the last section (3313), together with a fair compensation for the loss incurred by an effort in good faith to use it for such purpose." In the case of *McLennan* v. *Ohmen,* 75 Cal. 558, [17 Pac. 687], the warranty related to an engine which the seller warranted to save the buyer twenty-five per cent of his fuel bills. Evidence was taken that it increased the coal bill forty per cent. The judgment for damages was held to be supported by the evidence. *Greenleaf* v. *Stockton etc. H. & A. Works,* 78 Cal. 606, [21 Pac. 369], was an action for damages resulting from the failure of a threshing machine to meet the warranty as to its fitness to do a certain work. Actual damages sustained by plaintiff were recovered under the rule laid down in these code provisions. There was evidence in the present case ample to support the judgment.

The case was well and thoroughly tried and seems to have had careful attention by the learned trial judge and has been ably argued here. The manifest zeal and earnestness of counsel for defendants, and the insistence with which their many points are urged, must plead our apology for the unusual length of this opinion.

With the consideration we have been able to give the case we fail to discover any prejudicial error in the record, and the judgment is, therefore, affirmed.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 26, 1909.