[Civ. No. 6946. First Appellate District, Division Two.—October 29, 1929.]

ARCHIBALD ANDREW, Appellant, v. BANKERS AND SHIPPERS INSURANCE COMPANY OF NEW YORK (a Corporation) et al., Respondents.

W. S. Andrews and Edwin T. Cooper for Appellant.

Miller & Thornton for Respondents.

LUCAS, J., *pro tem.*—This is an action based upon alleged fraud and deceit. Archibald Andrew, plaintiff in the court below, sought therein to recover the sum of $14,594 paid by him to one E. A. Shouse for eleven automobile sale contracts which plaintiff claims he was induced to purchase by reason of the fraudulent statements, misrepresentations and deceit of the defendants. The contracts were later found to be fictitious and of no value.

At the trial of the cause, after plaintiff had rested, the defendant company moved for a nonsuit; the motion was granted and judgment entered accordingly, while, as to defendant Earsman, the case was continued for further hearing. When the trial was resumed, however, plaintiff rested without introducing any further evidence, and the said Earsman thereupon likewise moved for a nonsuit; his motion was granted and judgment was entered. From these orders and judgments plaintiff appeals.

The complaint contains eleven separate but similar counts. The allegations contained in the first count may be briefly summarized as follows: That the defendant company was and is a New York corporation, doing business in the state of California; that J. Murray Earsman was the agent of said company, authorized to execute and deliver policies of insurance and indorsements thereon, to make inspection of automobiles insured under said policies, and to represent in riders attached to the policies the fact of such inspection and the result thereof; that on or about February 18, 1920, one E. A. Shouse offered to sell and transfer to plaintiff a certain written conditional contract of sale covering a certain purported automobile therein described, together with promissory notes evidencing the balance due thereunder, said contracts and notes purporting to be executed by one R. H. Peppin as buyer while the said Shouse was named therein as seller; that at the same time, and as a part of the same transaction, the said Shouse offered to deliver and tendered to plaintiff an insurance policy issued by the defendant company, through its agent Earsman, insuring Shouse, Peppin, the Bank of Italy and the plaintiff Andrew

as their interests might appear against loss from fire and theft of the said purported automobile described in said contract; that the description of the said automobile set forth in said policy of insurance was the same as that contained in the aforesaid contract of sale between Shouse and Peppin; that at the same time, and as a part of the same transaction and for the purpose of inducing plaintiff to purchase said documents and automobile and the alleged title and interest of Shouse therein, said Shouse tendered and delivered to plaintiff a written rider or representation signed by Earsman, while acting within the scope of his authority as agent for such company and on behalf of said company. This rider was attached to said policy and was in words and figures as follows:

"7                    *Endorsement.*

"Effective date Feb. 14, 1920, assured R. H. Peppin, E. A. Shouse, Arch. Andrew and Bank of Italy, as int. may appear.

"Attaching to policy No. B 2727 of the Bankers and Shippers Insurance Company of New York.

"I have inspected automobile insured hereunder and find make and number of car to be correctly stated. Date — — February 14, 1920. J. Murray Earsman Agent. 12 19 3000 B."

It is further alleged that plaintiff, relying upon said written representation of defendants as to the inspection of said automobile and upon the said findings as to the correctness of the make and number thereof, purchased said above-mentioned contract and notes and paid Shouse therefor $359, no part of which sum has been repaid to plaintiff except the sum of $352; that said written representations in said rider contained were made, executed and issued by the defendant company by and through its agent Earsman for the purpose of inducing plaintiff to purchase said contract, notes and purported automobile, and with the knowledge that plaintiff would rely thereon in making such purchase; that said contract and notes were wholly fictitious and forged; that the alleged purchaser and automobile therein described were nonexistent; that no such automobile had ever been in the possession or under the control of said Shouse nor sold by him to anyone; that plaintiff obtained

no title or interest in any automobile, nor secured any claim against any purchaser; that said Shouse is insolvent and unable and refuses to repay plaintiff any of the money so paid by plaintiff as aforesaid; that defendants never inspected or attempted to inspect said automobile and never found the make or number thereof to be correctly stated; that said representations thereto were wholly false and untrue; that the defendants made the same without any reasonable grounds for believing them to be true and at said time knew them to be wholly false and untrue, and that they were made by defendants with the intent to induce plaintiff to purchase said documents, and that plaintiff relied and acted thereon to his damage in the sum of $7, no part of which has been paid.

The other ten counts of the complaint are the same as the first except as to dates, purchasers, automobiles, prices and amounts due.

The answers of the defendants are not set out in full in the record, but in the reporter's transcript appears a stipulation to the effect that both defendants had filed verified answers specifically denying all of the allegations contained in each and every count of the complaint except the one as to the incorporation of the defendant company, which allegation is admitted. In addition thereto the defendant company filed certain amendments to its answer in which it set up six separate affirmative defenses to eight causes of action, and five separate defenses to the remaining three causes of action. These special defenses briefly allege that each policy of insurance referred to in the complaint, under its terms, became void if the interest of the assured in the property covered thereby was other than sole and unconditional ownership; that at all times the automobiles referred to in said complaint were in existence; that Shouse, believed by Earsman to be a reliable man, misled and deceived Earsman as to the number and make of the automobiles; that the loss complained of by plaintiff, if any, was not caused by his reliance upon the insurance policies and the riders, but by his own negligence in failing to make investigation as to the truth of the statements contained therein before purchasing the contracts and notes, and by allowing monthly payments on the contracts to remain due and unpaid for over a year after Shouse had become in-

solvent and the policies of insurance had expired; and, lastly, that certain of the policies of insurance were canceled for nonpayment of premiums more than a year prior to the commencement of the action.

The defendant Earsman set up no special defense, but relied solely upon his specific denials of the allegations of the complaint.

Upon the issues thus formed the case went to trial.

The only evidence received was that offered on behalf of the plaintiff, which consisted of the eleven automobile sales contracts and the accompanying notes, the eleven insurance policies, each having attached thereto the so-called rider No. 7, notices sent out to the purported purchasers of the automobiles that the contracts had been assigned to the Bank of Italy, an agreed statement of facts, certain stipulations as to what one witness would testify to, and the oral testimony of plaintiff and one S. E. Biddle.

It appears therefrom that the plaintiff Andrew was and had been engaged in the business of lending money and discounting automobile paper; that he was and had been a client of the Bank of Italy, Oakland Branch, for many years; that said bank had frequently taken up automobile contracts on his order, making the payments therefor and thereafter collecting from plaintiff; that plaintiff was in good financial condition, and that his credit was good at the bank for substantial sums of money upon his unsecured promissory notes. It also appears that Andrew and Earsman were and had been friends for a number of years preceding the date of the transactions under consideration herein, and that for two or three years prior thereto they had been associated in business together; also, that prior to the purchase of the contracts in question the said Andrew had purchased several automobile contracts from Shouse which were accompanied by insurance policies to which no rider similar to rider No. 7 was attached; furthermore, that on one occasion Andrew had made to Shouse a secured loan of about $5,000.

Earsman, it appears, was an insurance agent with an established business in Oakland, and was the duly accredited agent of the defendant company. Shouse was an automobile dealer, handling principally used cars, which he sold on contract. These contracts he had been in the habit of dis-

counting to various parties, including plaintiff and the said Bank of Italy, delivering with each contract a policy of insurance. None of said policies had, prior to February, 1920, carried the rider above mentioned. It also appears from the evidence that this rider was originally drafted at the instance of the said Oakland Branch of the Bank of Italy, which institution had, some time prior to 1920, sustained a loss of about $4,000 by reason of having discounted certain spurious automobile contracts. To prevent a repetition of such loss, and to devise a means of protection against the recurrence thereof, several conferences were had between the said defendant J. Murray Earsman and S. E. Biddle, the then manager of said Oakland Branch of the Bank of Italy. At these conferences Biddle insisted, and it was agreed, that in the case of policies covering automobiles of Shouse and wherein plaintiff Andrew and the bank were named as the insured, an inspection of such automobiles should in each instance be made by Earsman, as the agent of the defendant company, that the make and the number of the automobiles should be checked, and that a certificate executed by Earsman as agent should be attached to each policy, certifying to such inspection and the result thereof. The form of the indorsement or rider was agreed upon and assented to by the defendant insurance company only after the bank had stated it would accept no more policies from said company unless they contained such riders. When this was agreed to, as aforesaid, the plaintiff Andrew was then notified by the bank that in all cases where it was going to loan him money and accept as collateral the contracts of Shouse, the above-mentioned rider must be attached to each policy of insurance accompanying such contracts. Thereupon Andrew decided that he wanted such riders attached to all of the policies received by him, whether he borrowed money from the bank on the accompanying contracts or not, and he and Biddle informed Earsman of this fact. Earsman thereupon agreed to make the inspection and to attach such certificates or riders to all of the Andrew policies. Shouse was notified of this action and condition.

Between the middle of February, 1920, and the first of February, 1921, plaintiff discounted and purchased from Shouse at various times, and principally through the Bank

of Italy, the eleven automobile contracts mentioned in the complaint, together with the notes evidencing the balance due thereunder. In each case, prior to the discounting of these contracts, Shouse applied to Earsman for an insurance policy upon the purported automobiles mentioned therein. Earsman, as the agent of the defendant company, issued the eleven policies above mentioned, to each of which there was attached rider No. 7, and he thereafter forwarded true and correct copies of said policies and riders to the general agency of the company in San Francisco.

Just what inspection was made by Earsman prior to issuing said policies and riders is a little uncertain. According to the evidence of Andrew and Biddle, Earsman admitted to them after the discovery of the fraud that he thought he had in some instances made the inspection, but that in most instances he had taken the word of Shouse that the car was there as represented, and that he did not personally examine any of said automobiles for the purpose of determining the numbers before he issued the policies and riders.

It is claimed, however, by the respondents that Earsman went to the place of business of Shouse and there saw automobiles of the same make and kind described in the policy, but that he did not in all cases look at the numbers. All parties admit that no inspection of any kind was ever made at any place other than the place of business of Shouse, and that none of the purported automobiles described in the eleven contracts of sale was ever registered with the motor vehicle department of the state of California. The eleven policies of insurance so issued, each with the said rider attached thereto, were delivered or transferred to Andrew or to the bank for him, along with the contracts for the sale of the purported automobiles covered by said policies. Upon receipt of said contracts, the Bank of Italy mailed to each of the purchasers therein named a notice stating that his contract had been assigned to the bank. In each instance Andrew repaid to the bank all of the money advanced by it in the purchase of these contracts. Payments were in some way made at various times upon six of the contracts—by whom it does not appear, while nothing was ever paid upon the other five.

Some time in February or March, 1921, it was discovered by all of the parties hereto, after investigation, that all of the eleven automobile contracts and notes which are the subject of this action were fictitious, spurious and forged, that none of said contracts or notes was signed by the persons named therein as vendees and makers, and that none of the automobiles referred to in said contracts was ever owned or possessed by Shouse, it was also discovered that the premiums on eight of the policies had never been paid, and that the defendant company had never been informed or learned prior to March, 1921, that in making the inspections certified to in said riders, Earsman had relied upon Shouse for the numbers of the automobiles and had not made a personal examination thereof. After the discovery of the fraud plaintiff instituted neither a civil nor criminal action against Shouse, but instead accorded him an opportunity to work out of the difficulty and to repay the moneys of which plaintiff had been defrauded. Nothing came of this arrangement, and early in 1922 plaintiff began the present action.

The motions for nonsuits upon which the judgments appealed from were based were made upon the following grounds: That no fraud had been shown; that the rights of plaintiff, if any, were based upon insurance policies; that said policies would have been enforceable only if the riders attached thereto were guarantees of ownership; that the policies were void; that the loss suffered was not covered by the policies; that there was no consideration for said policies, and that plaintiff's loss, if any, was caused by his own carelessness.

No consideration need be given to any of the foregoing grounds other than the ground that no fraud had been shown, as this is clearly an action sounding in fraud and deceit and not on contract. It is based upon the provisions of sections 1709 and 1710 of the Civil Code. These sections provide:

"Sec. 1709. One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

"Sec. 1710. A deceit, within the meaning of the last section, is either:

"1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

"2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true. . . . "

Several elements must be proven before a recovery may be had for fraud:

"Fraud may be the basis of an action for damages and deceit. When a cause arises out of an alleged false representation, the plaintiff, in order to prevail, must ordinarily show that the representation was as to a material fact; that such fact was false and known to be false by the party making it, or else recklessly made, or without reasonable grounds for believing its truth; that the representation was made with intent to induce the other party to do or refrain from doing some act; that it was relied upon by the other party—in other words, that such other party was actually misled and deceived and induced by it to act or refrain from acting; that in so acting or refraining from acting he was ignorant of the falsity of the representation and reasonably believed it to be true; and that he thereby suffered damage or injury. The absence of any one of these elements is generally fatal to a recovery." (12 Cal. Jur. 724.)

From the foregoing it is seen that to enable a plaintiff to recover in an action based upon fraud and deceit, it must first be made to appear that a false representation was made as to a material fact. The six elements necessary to a recovery in such an action, as set forth in the rule above announced, will be considered briefly herein in connection with the facts above stated.

█ First, as to the representation being of a material fact:

"To constitute fraud in any case the misrepresentation or concealment complained of must be of a material fact, for a representation, even though untrue, does not affect the validity of a transaction unless it is material. To be material, a representation must be of such a character that, if it had not been made, the contract or transaction would not have been entered into." (12 Cal. Jur. 740.)

█ The original fraud in this case was clearly the fraud of Shouse in forging the conditional automobile sales

contracts. By this act he created, for the purpose of sale and with the intent to defraud, contracts and promissory notes having absolutely no value. Before he could dispose of these contracts and promissory notes and perpetrate a fraud upon his friend Andrew or upon the Bank of Italy, however, it was necessary for him to secure policies insuring Andrew and the Bank of Italy against loss by fire or theft, and certifying that the agent for the company had personally inspected the automobiles insured thereunder and had found the make and number of the cars to be correctly stated. Both the bank of Italy and plaintiff had served notice that they would accept no more automobile paper from Shouse unless such policies and certificates were furnished. In his testimony at the trial of the cause the plaintiff in this regard testified positively that:

"Q. State what would have been your action with reference to the purchase of each of these documents in the eleven cases if that certificate had not been on there. A. I would have refused to buy the contract.

"Q. I will ask you if subsequently to the placing of this endorsement upon the insurance policies in the summer or fall of 1919 you ever purchased from Mr. Shouse any automobile paper without receiving the certificate of inspection mentioned in these policies? A. No.

"Q. State your belief, if any you had, in the truth of the representations made by that certificate of inspection in each case. A. I believed the inspection had been made as stated."

From this it appears that without the representation of a personal inspection having been made by Earsman plaintiff would not have purchased the contracts.

"Consent is deemed to have been obtained through one of the causes mentioned in the last section (fraud) only when it would not have been given had such cause not existed." (Sec. 1568, Civ. Code.)

In answer to the contention that the false representation was of a material fact, respondents make the point that the certificates or riders were of absolutely no value as a source of protection to purchasers of the contracts and notes for the reason that they contained no guarantee of ownership. The testimony adduced from plaintiff on cross-examination in this regard follows:

"Q. Let us see what it says: Here is the certificate. 'I have inspected automobile insured hereunder, and find make and number of car to be correctly stated.' A. Yes.

"Q. There is nothing there to the effect that Shouse was the owner of any car, is there? A. No.

"Q. There is nothing there guaranteeing that Shouse is the owner of any car? A. No.

"Q. As a matter of fact those automobiles might have been changed and might have the same number and Shouse still not own them? A. They might.

"Q. Where were you then protected by the certificate? A. In this way, that if he had gone to the place of business and failed to find a car of that make and number and had told me he could not put the endorsement on because he could not find it I certainly would not have paid the money on that contract.

"Q. But if there was any car there that was of the make covered by the policy and did have the number covered by the policy you would have then gone ahead irrespective of whether or not you knew Shouse was the owner of that car? A. Yes."

It is undeniably true that plaintiff, as the purchaser of forged automobile paper, would in nowise be protected against loss thereunder merely because an insurance agent certified that he had seen an automobile of the make and number mentioned in said paper in the possession of the seller thereof. If title were not in the seller, or if the contract to purchase were a forgery, the certificate would avail nothing and the purchaser of such paper would sustain a loss because of the forgery and fraud of the seller; but it is also true, as shown by the evidence, that the plaintiff would not have become a purchaser and would therefore not have suffered loss had it not been for the representation of the insurance company and its agent. In other words, whether the riders on the insurance policies were any protection to Andrew *after* he purchased the contracts and notes is of no moment. The important part, and that which makes the representation material, is that he would not have "altered his position to his injury or risk" by buying the contracts were it not for such representations. As a matter of fact the so-called riders on the policies and the truth of the representations contained therein were mate-

rial to plaintiff for two reasons: They at least assured him that automobiles of the make and number mentioned actually existed, and they enabled him to borrow money from his bank on the automobile contracts which said policies accompanied.

■ Second, as to the representation being false, and made knowingly or without reasonable grounds for belief in its truth: It may be conceded that defendant Earsman did not know that the automobiles were nonexistent, but it is also a conceded fact in the case that Earsman, in such inspection of the automobiles as he may have made, relied upon Shouse for the numbers thereof and that he knowingly misrepresented that he had made a personal inspection of the cars and found their makes and numbers to be as represented.

■ Third, as to the representations being made with intent to induce a party to act: It is the law that "Where one knows that he is stating an untruth in order to induce another to act to his injury, the intent to deceive is necessarily involved. Upon the principle that one is liable for the natural and necessary consequences of his acts, a party, knowing the circumstances, is guilty of fraud when he negligently, carelessly, or with lack of foresight, makes representations or commits acts, the natural and necessary consequence of which will be such as to cause deception, even though such party acts under the honest impression that he is violating no obligation or invading no right. In fact, gross negligence alone may furnish conclusive evidence of fraudulent intent, even where there is no actual intention to deceive." (12 Cal. Jur. 745, and cases cited.)

Furthermore, the evidence shows that Andrew had notified Earsman, the agent of the defendant company, that he wanted riders attached to all of his policies, whether he borrowed money thereon from the bank or not, and Earsman knew he would not accept the Shouse contracts without them. With this knowledge he agreed to make an inspection and to attach certificates to all of Andrew's policies.

■ Fourth, as to the representations being relied upon by plaintiff; and, fifth, that plaintiff believed them to be true: It has already been shown by plaintiff's testimony above quoted that he relied upon the representations and

believed them to be true. ▉ The motions for nonsuits having been made at the close of plaintiff's case operated as demurrers to the evidence and the evidence of plaintiff must therefore be taken as true. It is well settled in such circumstances that the evidence must be construed most strongly against the defendant, and that every favorable inference, fairly deducible, and every favorable presumption fairly arising from the evidence, must be considered as facts in favor of the plaintiff. (9 Cal. Jur. 551.)

▉ Sixth, as to damages: These follow as a natural consequence of plaintiff purchasing fictitious and valueless automobile paper which he would not have purchased but for the false representations of the defendant Earsman, Since Earsman was acting for the company, both should be held responsible,

The judgments appealed from are therefore reversed.

Sturtevant, J., and Nourse, Acting P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 26, 1929, and a petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 26, 1929.

All the Justices present concurred.