**STEIN et al. v. TREGER.**

No. 10019.

United States Court of Appeals District of Columbia Circuit.

Submitted Nov. 10, 1949.

Decided May 3, 1950.

Rehearing Denied June 15, 1950.

Mr. William R. Lichtenberg, Washington, D. C., with whom Mr. Samuel Barker, Washington, D. C., was on the brief, for appellants. Mr. Joseph Luria, Washington, D. C., also entered an appearance for appellants.

Mr. John L. Laskey, Washington, D. C., for appellee.

Before McALLISTER, sitting by designation, CLARK, and WILBUR K. MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

Appellee, Ely J. Treger, brought an action against appellant partners for damages sustained from claimed misrepresentations in the sale of whiskey. He received a verdict from a jury, and appeal is from the judgment entered thereon. Appellants claim that the verdict was against the weight of the evidence, and that the trial court erred in failing to instruct the jury that appellee should have made his

own investigation of the facts and was not entitled to rely upon the alleged representations.

The evidence disclosed that during June, 1946, when, because of scarcity, it was difficult to purchase whiskey at wholesale in substantial amounts, appellants, who were whiskey brokers, called Treger, a retail liquor dealer in Washington, D. C., and informed him that they were authorized to take orders for a wholesale firm, the North American Distributing Company, in Chicago. Treger testified that one of the appellant partners told him that he could get whiskey from the North American Distributing Company without any "tie-ins," meaning that he would not have to buy anything else to get the liquor in question; and that he could secure an unlimited amount of the whiskey, provided he paid a deposit of $10.00 a case, and signed the contract, "first come first served." Treger further stated that upon his inquiry as to the availability of the whiskey, appellants informed him that "the whiskey was in Chicago. It was just a question of getting the orders signed and ready and they would ship." In addition, Treger testified that he wanted to know whether appellants had investigated the Chicago company, inasmuch as this was his usual inquiry when he was dealing, through them, with a particular wholesaler for the first time; that appellants told him "they had investigated them, and they were financially all right, * * * and I had nothing to worry about and said I had never lost any money before in a deal with them, and to forget about that part of it."

Relying on the foregoing representations, as he claimed, Treger thereafter, through appellant partners, ordered from the Chicago company six hundred cases of Camel whiskey, to be shipped to him, beginning with one hundred cases in July, 1946, and one hundred cases each of the succeeding five months. He signed a contract for such purchase and paid $6,000, the required deposit. He thereafter received the first shipment of one hundred cases in September, instead of July, when it was to have been sent to him. On Octo-

ber 3, 1946, Treger testified, he went to the office of appellants, and told them that on account of the difficulties and delays in receiving the first shipment which had been two months late, he didn't feel as though he should be obliged to go on with the balance of the contract, and asked for the return of his deposit because of the breach of the agreement. Appellants, however, according to Treger, told him the whiskey was being bottled and shipped out of Baltimore, and deliveries were being made daily, and that if he did not go through with the deal, he would lose the $5,000 he had already deposited. Treger thereupon gave them a check for $3,172.10 to prepay the second shipment under the contract. This shipment was never delivered. The Chicago wholesaler became involved in financial difficulties, and bankruptcy proceedings were thereafter brought against it. Appellants denied that they had ever made any statements that the Chicago company was financially responsible, and contradicted appellee in much of his testimony as to the other claimed representations.

The district court ruled that two of the alleged representations were material: (1) the claimed representation made by appellants to Treger that the whiskey was available to the Chicago company to enable it to comply with the contract at the time it was signed; and (2) the representation that appellants had investigated the Chicago company and had found that it was financially responsible. The court instructed the jury that if it found these representations to have been made, it would then have to determine whether they were false and fraudulent and made with intent to cause Treger to act upon them, and whether he had acted upon them.

As to the first representation, appellants contend that the burden was upon Treger to prove that the whiskey was not available to the Chicago company to enable it to comply with the contract at the time it was signed; that there was no evidence whatever that the whiskey was not so available; and that it was error for the district court to submit to the jury the

question whether such representation was false and fraudulent.

On the question whether the whiskey was available to the Chicago company at the time the contract was signed with Treger, appellant Ney testified that he had a conference with Vombrack and Arnopolin, officials of the Chicago company, before entering into business relations with respect to the sale of the whiskey, and that he stated to them: "Before we go into this deal, there are a few questions I want to ask. I asked: 'Do you own this whiskey?' And Mr. Vombrack and Mr. Arnopolin assured me at that time that they owned that whiskey and showed me a typewritten list of the dates of distillation dates of each grade of whiskey that they owned." Ney found out afterward that, at the time Treger signed the contract, the whiskey was on hand, but subject to liens —that "Mr. Vombrack had the certificates in hock at a bank in Salt Lake City * * He didn't own them outright. There was money loaned against them." Subsequently, Ney learned that when Vombrack bought the company, he came into possession of the whiskey in Salt Lake City, which he thought it owned; but the actual fact was that he could secure it only after he paid the liens. Later, Mr. McKee, the executive secretary of the Retail Liquor Dealers Association, in Washington, D. C., who, after the difficulties arose, was appointed by Treger and a number of other Washington retail liquor dealers as their attorney in fact to initiate proceedings, compromise claims, accept payment, and prosecute actions on their behalf against the Chicago company, testified that when he investigated the matter in December, 1946, in Chicago, the company had 502 barrels of whiskey, subject to collateral lien.

■ We are of the opinion that the trial court properly submitted to the jury the question whether the representation that the whiskey was available, was made to Treger by appellants; whether, if made, it was false and fraudulent; and whether Treger acted upon it. Treger testified that the material representation, as heretofore mentioned, was that the whiskey was in Chicago; that he could get all he wanted;

that it was just a question of getting the order signed and the shipments would be made. This was a representation that all the whiskey Treger wanted was immediately available. But there was evidence from which reasonable inferences could be drawn by the jury that the whiskey was not immediately available. It was subject to liens held in a bank in Salt Lake City, which it was necessary to pay before the whiskey, could be released to the Chicago company. This was the thing that snagged the hook, and, in all probability, caused the delay of two months in making the first shipment to Treger. It was the liens that brought about the bankruptcy proceedings, because of the Chicago company's inability to get the whiskey released for delivery. When McKee investigated the situation in Chicago in December, 1946, the company still had hundreds of barrels of whiskey, but it was all subject to lien, and neither Vombrack nor the other officials of the company could secure its release. McKee testified that under a plan by which a third party was to enter the business and invest new capital, the Chicago company proposed to the retailers that it would carry out the original whiskey purchase contracts, and he advised the retailers for whom he was acting that if they agreed to such a plan, the company, in his opinion, would be able to comply with it. So it clearly appears that the reason for the nondelivery of the whiskey to Treger and the other retailers was due to the fact that the whiskey was subject to liens and the company lacked cash to pay them; and this accounts for the failure of the company to fulfill its contracts.

■ Under these circumstances, the jury could find that the representations made to Treger that the whiskey was immediately available, as above outlined, were false. If the representations were known to be false, they would be fraudulent; and if made by appellants, as upon their own knowledge, or as a matter of fact, even though not known by them to be untrue, they would be false and fraudulent. One may honestly make a false representation, believing it to be true, but if

made as a statement of fact, it is false and fraudulent.

■ Appellants denied that they told Treger that they had investigated the Chicago company and had represented to him that it was financially responsible. Whether they made such a representation was for the jury. Moreover, the fact that the company was unable to carry out its contracts; that its officials were known to be black market racketeers; that the deposits made by purchasers were used, as Ney later found out, to buy bulk whiskey in and around Chicago; that one of the officials had a rather lengthy criminal record; that there were liens on the whiskey; and that it was necessary to get an outsider to advance cash so that the whiskey could be released from the liens—all this is evidence from which inferences could be drawn that the company was not "financially all right" at the time Treger signed the contract. Whether appellants made such representations to Treger, and whether they were false, was for the jury.

■ It is contended that the court erred in refusing to instruct the jury as to Treger's duty to make his own investigation of the wholesaler in Chicago. However, even though Treger could have investigated the matter, there was no obligation upon him to do so at his peril, unless the circumstances were such as to put him on notice. As a retail purchaser, he was entitled to rely upon the representations of the broker concerning their principal's financial standing, especially after they had gone to Chicago and made the representation to Treger that they had investigated that particular matter; and he was also entitled to rely upon the broker's assurance that the whiskey was all in Chicago and immediately available to anyone who would sign the order and make the required payment. Treger could not be said to be guilty of voluntary blindness in not seeing matters before him, for these matters were not before him. He could, of course, have made an investigation himself, but so could almost everyone else who has ever been defrauded by fraudulent representations. One does not generally rely upon such representations, at his own risk.

■ From a scrutiny of the entire record, it clearly appears that whatever representations were made by appellants Stein and Ney to Treger were honestly made without any knowledge on their part that they were untrue. But, as has been observed, representations, even though believed to be true, or made as of one's own knowledge, are fraudulent if, in fact, false; and though innocent of any wrongful intent in their transactions with Treger, appellants Stein and Ney are, by the jury's verdict, answerable for the damage resulting from the dereliction of their principal.

The judgment of the District Court is affirmed.

Affirmed.

### On Petition for Rehearing

■ The above cause came on to be heard on appellant's petition for rehearing on the issue whether an innocent misrepresentation of fact may operate as a fraudulent representation; and that is the sole issue. Where a party innocently misrepresents a material fact by mistake; or makes such representation without knowing it to be true or false, even though he believes it to be true; or without reasonable grounds for believing it to be true—such representation will support an action for fraud. Anderson v. Tway, 6 Cir., 143 F.2d 95, certiorari denied 324 U.S. 861, 65 S.Ct. 865, 89 L.Ed. 1418; Sovereign Pocohontas Co. v. Bond et al., 74 App.D.C. 175, 120 F.2d 39; Grand Trunk Western R. Co. v. H. W. Nelson Co., 6 Cir., 116 F.2d 823; Schwinn v. United States, 9 Cir., 112 F. 2d 74, affirmed 311 U.S. 616, 61 S.Ct. 70, 85 L.Ed. 390; Panther Rubber Mfg. Co. v. Commissioner, 1 Cir., 45 F.2d 314; Nocatee Fruit Company v. Fosgate, 5 Cir., 12 F.2d 250.

The petition for rehearing is denied.