[L. A. No. 23098. In Bank. Oct. 19, 1954.]

ALFRED GAGNE et al., Respondents, v. BENJAMIN E. BERTRAN, Appellant.

Wallace & Cashin, W. W. Wallace and Earl A. Everett for Appellant.

Nicolas Ferrara for Respondents.

TRAYNOR, J.—The evidence in this case is in sharp conflict and is considered here in the light most favorable to plaintiffs. Plaintiffs had contracted to buy two unimproved lots for $8,500 "subject to . . . a fill test to be made at buyer's expense." Plaintiff Joseph Billiet telephoned defendant that he had a contract to buy the lots but "would not proceed with the deal unless we had a test made for fill, and I told him if he would like to do it, I would like to have him handle it because he handled my work before, so he said, 'All right, I will take care of it.' " Billiet testified that between 1939 and 1942 defendant told him that it was his business to test soil for fill and that he employed defendant on four different occasions for that purpose. Defendant did not tell plaintiffs at any time that he was not a geologist or soil engineer or that plaintiff should get an engineer or city inspector to check the soil. Defendant fixed the price for his services at $10 per hour, which plaintiffs agreed to pay. On March 7, 1947, several days after this telephone conversation, defendant sent two employees and a drilling rig to plaintiffs' lots. Several holes had been drilled when Billiet arrived at the lots; defendant arrived shortly thereafter. Billiet testified that he remained on the sidewalk near the street while defendant picked up and examined samples of soil at each of the holes drilled. The location, depth, and number of holes to be drilled were entirely under the control of defendant. After defendant had examined samples of soil from each of the holes, he directed his employees to close the holes and told Billiet that he had "nothing to worry about here. It is perfectly okay. . . . You may go 12 to 16 inches but that is about all. . . . You have got a normal condition here, for about an 18 inch foundation." Defendant's employee in charge of the drilling rig testified, however, that he observed evidence of fill 4-5 feet deep in several of the holes, but did not inform either his employer or plaintiff of that fact. On March 17, 1947, in response to defendant's invoice, plaintiffs mailed defendant a check for $25 for his services and requested a letter from defendant stating his "findings" because it might be required by F.H.A. Defendant replied that "On March 7, 1947 we drilled five 16" dia. test holes . . . the holes were drilled to a depth of 5'0 to 6'0 deep, we did not find any evidence of fill other than on the surface for about 12" to 16"." Defendant's invoice included the printed statement that among other things he did "test drilling." Billiet testified that in reliance on

defendant's oral and written statements about the extent of the fill they bought the lots for $8,500 and that they would not have bought them had they known that defendant's statements were erroneous.

After purchasing the lots, plaintiffs decided to erect a two-story apartment building thereon. They entered into contracts for the construction of the building and for a loan to finance the construction. Plaintiffs' contract for the installation of the foundation at a cost of $3,121.40 was based on defendant's report that there was no fill below 16 inches and was expressly subject to an additional charge in the event the contractor encountered "unforeseen conditions such as fill and extra work is required. . . ." As the first foundation trench was being dug, it was discovered that the lots contained areas with 3 to 6 feet of fill. When notified by Billiet of this condition, defendant came to the site, looked at the trenches that had been dug, and stated that he had "evidently made a mistake." The depth of the fill required a much deeper foundation.[1] than defendant's report had led plaintiffs to expect.

Plaintiffs brought this action to recover the increased cost of installing the foundation. Their complaint stated three alternative theories of recovery: (1) breach of warranty, (2) deceit, and (3) negligence. The trial court made findings supporting a recovery on each of these theories. It found, among other things, that defendant held himself out as being qualified to make soil tests; that defendant represented and warranted to plaintiffs that there was no fill beyond 16 inches; that plaintiffs believed and acted in reliance on this representation and warranty, which was untrue; that defendant made his test for fill negligently and carelessly; that defendant had no reasonable grounds for believing his representation to be true; that the additional expenses plaintiffs incurred in the installation of the foundation were proximately caused by defendant's warranty, misrepresentation, and negligence; that plaintiffs did not know the true depth of the fill until the foundation trenches were being dug, and that had they known the true depth of the fill, they would not have purchased the lots. Judgment was entered awarding plaintiffs $3,093.65, the increased cost of installing the foundation. Defendant appeals. He challenges

---

[1]The Los Angeles Municipal Code, section 91.4807, Table 48-A, requires the depth of the foundation for a two-story building to be 18 inches below undisturbed natural ground surface.

the sufficiency of the evidence to support the findings of fact and contends that the trial court did not apply the proper measure of damages. We have concluded that these contentions are, in part, well taken, and that the judgment must be reversed.

### The Cause of Action for Breach of Warranty

Plaintiffs contend that defendant undertook to guarantee the accuracy of the results of his test, not on the ground that there was an express warranty agreement, for there is no evidence of such an agreement, but on the ground that under the circumstances of this case the law imposes the strict liability of a warranty.

For historical reasons warranties have become identified primarily with transactions involving the sale or furnishing of tangible chattels (see Prosser, Torts [1941], pp. 739-740; 1 Williston on Sales [rev. ed., 1948], §§ 195-197), but they are not confined to such transactions.[2] Strict liability has also been imposed for innocent misrepresentations of facts that the maker purported to know, that the recipient relied on in matters affecting his economic interests, and that the maker positively affirmed under circumstances that justify the conclusion that he assumed responsibility for their accuracy.[3]

[2]One who acts as an agent warrants his authority to so act. (Rest., Agency, § 329; Civ. Code, § 2342); bailors and leasors warrant certain qualities of bailed and leased chattels (*Kersten* v. *Young*, 52 Cal.App.2d 1, 6-7 [125 P.2d 501]; *Fisher* v. *Pennington*, 116 Cal.App. 248, 251 [2 P.2d 518]; in certain cases a contractor warrants the soundness of his job (*Kuitems* v. *Covell*, 104 Cal.App.2d 482, 484 [231 P.2d 552]); a shipowner warrants the seaworthiness of his vessel (*Commercial Molasses Corp.* v. *New York Tank Barge Corp.*, 314 U.S. 104, 110 [62 S.Ct. 156, 86 L.Ed. 89]; *O. F. Nelson & Co.* v. *United States*, 149 F.2d 692, 694; *The Arakan*, 11 F.2d 791, 792); the owner of a building to be erected warrants the workability of the architect's plans that he furnishes to the contractor (*Montrose Contracting Co.* v. *Westchester County*, 80 F.2d 841, 842; Williston on Contracts [rev. ed. 1938] § 1966 and cases cited; see also *McConnell* v. *Corona City Water Co.*, 149 Cal. 60, 63 [85 P. 929, 8 L.R.A.N.S. 1171]); and those in the business of supplying food and drink warrant the fitness of their products for human consumption (*Burr* v. *Sherwin-Williams Co.*, 42 Cal.2d 682, 695 [268 P.2d 1041] and cases cited).

[3](*Mayer* v. *Salazar*, 84 Cal. 646, 649-650 [24 P. 597]; *Lahay* v. *City Nat. Bank of Denver*, 15 Colo. 339 [25 P. 704, 705, 22 Am.St.Rep. 407]; *Watson* v. *Jones*, 41 Fla. 241 [25 So. 678, 683]; *Coolidge* v. *Rhodes*, 199 Ill. 24, 32 [64 N.E. 1074]; *Tott* v. *Duggan*, 199 Iowa 238 [200 N. W. 411]; *Becker* v. *McKinnie*, 106 Kan. 426 [186 P. 496]; *Prewett* v. *Trimble*, 92 Ky. 176 [17 S.W. 356, 357, 36 Am.St.Rep. 586]; *Braley* v. *Powers*, 92 Me. 203 [42 A. 362, 364]; *New England Foundation Co.* v. *Elliott & Watrous, Inc.*, 306 Mass 177, 183 [27 N.E.2d 756]; *Krause* v. *Cook*, 144 Mich. 365 [108 N.W. 81, 82]; *Tischer* v. *Bardin*, 155 Minn. 361 [194 N.W. 3, 5]; *Peterson* v. *Schaberg*, 116 Neb. 346 [217 N.W. 586, 587];

The evidence in the present case does not justify the imposition of the strict liability of a warranty. There was no express warranty agreement, and there is nothing in the evidence to indicate that defendant assumed responsibility for the accuracy of his statements. He did not, as did the defendant in *Crawford* v. *Duncan,* 61 Cal.App. 647, 650 [215 P. 573], tender plaintiffs an "absolute promise" that the results of his test would be accurate. He was not a seller of property who obligated himself as part of his bargain to convey property in the condition represented. The amount of his fee and the fact that he was paid by the hour also indicate that he was selling service and not insurance. Thus the general rule is applicable that those who sell their services for the guidance of others in their economic, financial, and personal affairs are not liable in the absence of negligence or intentional misconduct.

### THE CAUSE OF ACTION FOR DECEIT

To be actionable deceit, the representation need not be made with knowledge of actual falsity, but need only be an "assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true" (Civ. Code, § 1710, subd. 2[4]; *Gonsalves* v. *Hodgson,* 38 Cal.2d 91, 100 [237 P.2d 656]; *Hoffman* v. *Kirby,* 136 Cal. 26, 29 [68

*Hadcock* v. *Osmer,* 153 N.Y. 604, 609-610 [47 N.E. 923]; *Jacquot* v. *Farmers' Straw Gas Producer Co.,* 140 Wash. 482 [249 P. 984, 986-987]; *Palmer* v. *Goldberg,* 128 Wis. 103, 111 [107 N.W. 478]; *Lehigh Zinc & Iron Co.* v. *Bamford,* 150 U.S. 665, 673 [14 S.Ct. 219, 37 L.Ed. 1215]; *Stein* v. *Treger,* 182 F.2d 696, 699; see also *Edwards* v. *Sergi,* 137 Cal. App. 369, 373 [30 P.2d 541] [vendor "presumed" to know the truth]; *Harris* v. *Delco Products, Inc.,* 305 Mass. 362, 365-367 [25 N.E.2d 740]; *Tate* v. *Bates* 118 N.C. 287 [24 S.E. 482, 483, 54 Am.St.Rep. 719]; *Trust Co. of Norfolk* v. *Fletcher,* 152 Va. 868 [148 S.E. 785, 788, 73 A.L.R. 1111]; Civ. Code, § 1572 [2].) Whether this liability should be regarded as part of the law of warranty or as a form of deceit (see Williston, *"Liability For Honest Misrepresentation,"* 24 Harv.L.Rev. 415; Bohlen, *"Misrepresentation as Deceit, Negligence, or Warranty,"* 42 Harv.L.Rev. 733) we need not now determine. If plaintiffs had alleged and proved facts that justify its imposition, a mislabelling of their cause of action would be immaterial. (Code Civ. Proc., §§ 307, 426.)

[4]Since the Legislature in this section of the Civil Code has made the cause of action for negligent misrepresentation a form of deceit, statements in a number of cases, contrary to this section and the cases cited in the text, that scienter is an essential element of every cause of action for deceit are erroneous and are therefore disapproved. (See, for example, *Podlasky* v. *Price,* 87 Cal.App.2d 151, 161 [196 P.2d 608]; *Swasey* v. *de L'Etanche,* 17 Cal.App.2d 713, 716-717 [62 P.2d 753]; *Palladine* v. *Imperial Valley Farm Lands Assn.,* 65 Cal.App. 727, 742 [225 P. 291]; *Griswold* v. *Morrison,* 53 Cal.App. 93, 101 [200 P. 62]; *Smeland* v. *Renwick,* 50 Cal.App. 565, 569 [196 P. 283].)

P. 321]; *Daley* v. *Quick*, 99 Cal. 179, 182 [33 P. 859]; *Lerner* v. *Riverside Citrus Assn.*, 115 Cal.App.2d 544, 547 [252 P.2d 744]; *Wishnick* v. *Frye*, 111 Cal.App.2d 926, 930 [245 P.2d 532]; *Morrell* v. *Clark*, 106 Cal.App.2d 198, 201 [234 P.2d 774]; *Graham* v. *Ellmore*, 135 Cal.App. 129, 132 [26 P.2d 696]; *Williams* v. *Spazier*, 134 Cal.App. 340, 345-346 [25 P.2d 851]; *Andrew* v. *Bankers & Shippers Ins. Co.*, 101 Cal. App. 566, 575 [281 P. 1091]; Rest., Torts § 552; see also Civ. Code, § 1572, subd. 2; *Horrell* v. *Santa Fe Tank & Tower Co.*, 117 Cal.App.2d 114, 119 [254 P.2d 893]) and made "with intent to induce [the recipient] to alter his position to his injury or his risk. . . . " (Civ. Code, § 1709[5]; *Gonsalves* v. *Hodgson, supra*, 38 Cal.2d 91, 100; *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 422 [159 P.2d 958]; *Estate of Newhall*, 190 Cal. 709, 718 [214 P. 231, 28 A.L.R. 778]; *Work* v. *Campbell*, 164 Cal. 343, 347 [128 P. 943, 43 L.R.A.N.S. 581]; *Carlson* v. *Murphy*, 8 Cal.App.2d 607, 609-612 [47 P.2d 1100].)

█ Defendant's intent to induce plaintiffs to alter their position can be inferred from the fact that he made the representation with knowledge that plaintiffs would act in reliance thereon. (*Glanzer* v. *Shepard*, 233 N.Y. 236, 239 [135 N.E. 275]; see also *International Products Co.* v. *Erie R. Co.*, 244 N.Y. 331, 339 [155 N.E. 662, 56 A.L.R. 1377].) The evidence discloses that defendant's statement was erroneous, that, as will be shown presently, defendant negligently performed the fill test, that his statement was therefore made without reasonable ground for believing it to be true (see *International Products Co.* v. *Erie R. Co., supra*, 244 N.Y. 331, 338), and that plaintiffs justifiably relied on his statement in purchasing the lots and in making their contracts for the erection of the building.

Defendant contends, however, that even if his statement was erroneous, it was not a misrepresentation of fact, but was only a statement of opinion and thus cannot form the basis of an action for deceit. █ Defendant drilled the holes,

---

[5]Under this section of the Civil Code the intent required to prove a cause of action for deceit is an intent to induce action. An "intent to deceive" is not an essential element of the cause of action, and statements in a number of cases, contrary to this section and the cases cited in the text, that such an intent is an essential element of deceit are erroneous and are therefore disapproved. (See, for example, *Cardozo* v. *Bank of America*, 116 Cal.App.2d 833, 837 [254 P.2d 949]; *Hayter* v. *Fulmor*, 92 Cal.App. 2d 392, 398 [206 P.2d 1101]; *Boas* v. *Bank of America*, 51 Cal.App.2d 592, 598 [125 P.2d 620]; *Griswold* v. *Morrison, supra*, 53 Cal.App. 93, 97; *Smeland* v. *Renwick, supra*, 50 Cal.App. 565, 569; *Hodgkins* v. *Dunham*, 10 Cal.App. 690, 698 [103 P. 351].)

examined the soil, and told Billiet that the fill was only 12-16 inches in depth. He did not give his statement in the form of an opinion but as a representation of fact. (See *Edward Barron Estate Co.* v. *Woodruff Co.*, 163 Cal. 561, 573 [126 P. 351, 42 L.R.A.N.S. 125]; *Blackman* v. *Howes*, 82 Cal.App.2d 275, 281 [185 P.2d 1019, 174 A.L.R. 1004]; *Haserot* v. *Keller*, 67 Cal.App. 659, 670-671 [228 P. 383]; *Palladine* v. *Imperial Valley Farm Lands Assn.*, 65 Cal.App. 727, 737-739 [225 P. 291].) His assertion was not a casual expression of belief, but was a deliberate affirmation of the matters stated and was thus within the statute, which requires only that he assert, "*as a fact*, . . . that which is not true. . . ." [Italics added.] (Civ. Code, § 1710, subd. 2.)

Moreover, even if defendant's statement was an opinion, plaintiffs justifiably relied thereon. Defendant held himself out as an expert, plaintiffs hired him to supply information concerning matters of which they were ignorant, and his unequivocal statement necessarily implied that he knew facts that justified his statement. (*Seeger* v. *Odell*, 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291]; *Union Flower Market, Ltd.* v. *Southern Cal. Flower Market, Inc.*, 10 Cal.2d 671, 676 [76 P.2d 503]; *Harris* v. *Miller*, 196 Cal. 8, 13 [235 P. 981]; *Herdan* v. *Hanson*, 182 Cal. 538, 546 [189 P. 440]; *Tracy* v. *Smith*, 175 Cal. 161, 165 [165 P. 535]; *Sime* v. *Malouf*, 95 Cal.App.2d 82, 101 [212 P.2d 946, 213 P.2d 788]; *Eade* v. *Reich*, 120 Cal.App. 32, 35 [7 P.2d 1043]; *Haserot* v. *Keller, supra*, 67 Cal.App. 659, 670.) The cause of action for deceit was therefore established by the evidence.

### THE CAUSE OF ACTION FOR NEGLIGENCE

The services of experts are sought because of their special skill. They have a duty to exercise the ordinary skill and competence of members of their profession, and a failure to discharge that duty will subject them to liability for negligence. Those who hire such persons are not justified in expecting infallibility, but can expect only reasonable care and competence. They purchase service, not insurance. (*Perkins* v. *Trueblood*, 180 Cal. 437, 441 [181 P. 642] [physician]; *Speer* v. *Brown*, 26 Cal.App.2d 283, 288, 294 [79 P.2d 179] [physician]; *Sim* v. *Weeks*, 7 Cal.App.2d 28, 33 [45 P.2d 350] [physician]; *Walter* v. *England*, 133 Cal.App. 676, 679 [24 P.2d 930] [dentist]; *Page* v. *Wells*, 37 Mich. 415, 421 [timber appraiser]; *Edwards* v. *Lamb*, 69 N.H. 599 [45 A. 480, 50 L.R.A. 160] [physician]; *Skillings* v. *Allen*, 143 Minn.

490

323 [173 N.Y. 663, 5 A.L.R. 922] [physician]; *Noble* v. *Libby*, 144 Wis. 632, 637 [129 N.W. 791] [timber appraiser].)

█ Defendant's duty of care in performing the soil test was established by his contract with plaintiffs. His failure to discharge that duty was established by the testimony of his employee that the employee noticed evidence of fill 4-5 feet below the surface, as well as by the testimony of the persons who dug the foundation trenches. This testimony indicates that had defendant made his test with due care, he would have discovered the true extent of the fill, and it supports the inference that defendant made his test in a careless and negligent manner. Defendant's repeated assertion that he was not qualified to test soil for fill, contrary to the finding that he so held himself out, and the testimony of his expert witness that laboratory tests were necessary, also indicate that defendant did not exercise the ordinary skill and competence of those in the business of soil testing. His failure to do so, as found by the trial court, supports the cause of action for negligence.

### The Measure of Damages

The only question remaining is the measure of damages to be applied. █ Plaintiffs contend that the trial court correctly measured the damages by the difference between the actual cost of the foundation and what it would have cost had defendant's representations been true. This measure would have been a proper one had defendant undertaken to insure that the lots had no fill beyond 12-16 inches in depth. As indicated above, however, defendant's undertaking was limited to exercising due care to determine and report the extent of the fill, and the damages, whether for deceit or negligence, must be measured by the actual losses suffered because of the misrepresentation. (Civ. Code, §§ 1709, 3333; see also *Edward Barron Estate Co.* v. *Woodruff Co.*, 163 Cal. 561, 577-578 [126 P. 351, 42 L.R.A.N.S. 125]; McCormick on Damages [1935], p. 449.)

█ In reliance on defendant's information plaintiffs purchased the property. If the property was worth less than they paid for it, defendant is liable for the difference.[6] On

---

[6]On a retrial of this cause, plaintiffs can amend their complaint to allege such damages and produce evidence to establish the allegation. They are also entitled to recover any consequential damages resulting from the purchase of the lots in reliance on defendant's misrepresentations. (See *Bagdasarian* v. *Gragnon*, 31 Cal.2d 744, 762-763 [192 P.2d 935]; *Edward Barron Estate Co.* v. *Woodruff Co.*, 163 Cal. 561, 577-578 [126 P. 351, 42 L.R.A.N.S. 125].)

the other hand, if the lots were worth what plaintiffs paid for them, plaintiffs were not damaged by their purchase, for even though they would not have bought the lots had they known the truth, they nevertheless received property as valuable as that with which they parted.

Plaintiffs also undertook to build on the property before they discovered the extent of the fill. At the time they discovered the truth, they were so far committed to their building project that it would be unreasonable to require them to terminate it to mitigate damages. (*Bomberger* v. *McKelvey*, 35 Cal.2d 607, 614 [220 P.2d 729]; see also Rest., Contracts, § 336, comment a.)

The additional costs plaintiffs incurred in the installation of the foundation were not caused by defendant's misinformation, however, but by the physical condition of the land. The true condition was discovered in time to alter the plans, and it does not appear that plaintiffs had to abandon any of their work or to undo any of it and start over. Thus this is not a case in which plaintiffs wholly or partially completed their building before they discovered the truth and thereafter had to abandon it or make costly alterations that would not have been required had they known the true condition of their land at the outset of construction. Such damages, had they been suffered, would have resulted directly from defendant's failure to report the truth and would clearly be recoverable. In the present case, plaintiffs have proved only that they were induced to commit themselves to a building venture and that the cost of the building exceeded the anticipated cost by $3,093.65. Given the decision to build, however, these costs would have been incurred whether or not defendant correctly reported the extent of the fill, and the question presented is, therefore, whether or not plaintiffs have proved that they suffered damage as a result of being induced to build on their property. This question is basically the same as the question whether or not they proved that they suffered damage as a result of being induced to buy the lots in the first instance.

It may be assumed that lots with 3 to 6 feet of fill would not be as valuable as ones identical in other respects with only 12 to 16 inches of fill. Accordingly, by proving that the fill was deeper than defendant had reported, plaintiffs established that they were induced to buy lots that were less valuable than they had anticipated. As stated above, however, since they did not prove that the lots were worth

less than they paid for them, they failed to establish damages flowing from their decision to buy. Similarly, if despite the additional cost, plaintiffs secured a building that was worth as much or more than it reasonably cost them to erect, no damages flowed from their decision to build. Plaintiffs did not prove that the extent of the fill made the lots unsuitable for their intended use, or that because of it, the reasonable cost of their building exceeded its value, and they successfully prevented defendant from introducing evidence that the value of the property as improved exceeded the amount plaintiffs invested in it. After plaintiffs purchased the lots they owned property that was suitable for the use they intended to make of it. Because of defendant's negligence plaintiffs erroneously believed that it was more suitable for their purpose than it actually was. The additional expense they incurred, however, flowed from the condition of their land and not from defendant's report as to what that condition was. Thus, although they would not have undertaken to build had they known the truth, they have not proved any losses flowing from that decision.

The judgment is reversed.

Edmonds, J., Carter, J., Spence, J., and Bray, J. pro tem.,* concurred.

SCHAUER, J.—I do not agree with that portion of the majority opinion which discusses the measure of damages for defendant's wrong. As indicated in the majority opinion, the Civil Code (§ 3333) prescribes the measure of damages. Section 3333, which applies both to an action for negligence and to one for deceit, provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

According to the majority opinion, the additional costs incurred by plaintiffs because the land was filled to a depth of 3 to 6 feet, rather than to a depth of 12 to 16 inches as reported by defendant, "were not caused by defendant's misinformation . . . but by the physical condition of the land." But the sole object of the employment of defendant by plaintiffs was to ascertain the condition of the land and it is only

---

*Assigned by Chairman of Judicial Council.

the extra cost to defendants in dollars and cents arising from the fact that the condition of the land was not as represented by defendant that plaintiffs seek to recover. I cannot agree that defendant did not "cause" plaintiffs to incur these additional expenses so as to render defendant liable therefor. If defendant had truly reported the condition of the land plaintiffs would not have purchased it at all.

According to the theory of the majority opinion if plaintiffs in reliance on defendant's representation had constructed the building without discovering the truth as to the condition of the land and if the building, by reason of foundations inadequate because of the unreported depth of the fill, had collapsed, plaintiffs could not recover from defendant the cost of rebuilding or any other sum unless the bare land on the day it was purchased was worth less than the sum paid for it, and such difference, if any, would be the exclusive measure of damages.

Because of defendant's misrepresentation plaintiffs purchased the lots, entered into an agreement to pay $3,121.40 for the construction of a foundation, *plus additional charges if unforeseen conditions such as the existence* of a fill deeper than 16 inches required extra work, and entered into contracts for the construction of a building and for a loan to finance the construction. In constructing the foundation the contractor did encounter the unforeseen condition of the deeper fill and as a result plaintiffs incurred additional expenses of $3,093.65. Whatever the actual value of the land was at the time of purchase and whatever the selling price eventually may be, it is indisputably true that plaintiffs are actually "out of pocket" the sum of $3,093.65 more as the cost of the improved property than they would have been if defendant's representation had been true. In my opinion defendant's representation should be held to constitute a proximate, legal cause of plaintiffs' additional cost; in the language of section 3333 the additional cost was "detriment proximately caused thereby"; the extra cost would not have been incurred if defendant had not made the false representation.

The effect of the majority opinion is to limit plaintiffs' recovery to an artificially limited so-called "out-of-pocket" loss (see Civ. Code, § 3343). In *Bagdasarian* v. *Gragnon* (1948), 31 Cal.2d 744, 759, 762 [192 P.2d 935], a majority of this court held that the artificially limited and inaccurately designated "out-of-pocket" measure of damages provided for in section 3343 of the Civil Code and made available to one

defrauded in the purchase, sale, or exchange of property, is the *exclusive*, rather than, at the option of the wronged person, an *alternative*, measure of damages in such a case. Although I do not agree with this holding (see my dissent in the Bagdasarian case, p. 764 of 31 Cal.2d), I recognize it as currently the law of this state. But I cannot approve the extension of the rule so limiting damages for the benefit of fraudulent vendors to include in the class of favored persons[1] a person such as defendant here who is not by the terms of the statute within the class. Defendant here is not the fraudulent seller or buyer of property, but one who was employed as an expert soil engineer or "test driller" to render skilled personal services; i. e., to do whatever was necessary to ascertain and inform plaintiffs of the true condition as to the extent of any fill on the property so that they might intelligently and accurately compute the cost of improving it and, accordingly, determine whether they would buy it and, if so, how they would improve it.

The measure of responsibility of defendant for the negligent performance of his obligation and for the false representation as to the condition of the thing he was employed to ascertain and report on should certainly be no less than that, for example, of a member of the legal profession who is employed to examine and report on the condition of title to land proposed to be purchased or accepted as security for a loan. If the lawyer is incompetent, performs his work in a negligent manner, and reports a false condition when the true condition would have been discovered and reported by a competent lawyer exercising ordinary care, and, as a consequence, the client purchases the property or loans on its security and subsequently finds that the title is already encumbered, is the client to be denied recovery because (paraphrasing the language of the majority opinion) "the loss he incurred flowed from the condition of the title to the land and not from defendant's report as to what that condition was"? As hereinafter shown, the cases establish that the rule is to the contrary.

It is so well established as to need no citation of authority

---

[1]It is to be presumed that the Legislature by enacting Civil Code, section 3343, intended to provide further (and alternative) protection for the wronged victim of fraud, but by the judicial interpolation in the Bagdasarian case which reads into the statute a provision that it shall be the *exclusive* remedy in cases of fraud, the court has made a shield for the wrongdoer out of what was intended as a sword for the victim. (See also 5 Williston on Contracts (rev. ed.) § 1392, p. 3886.)

that persons who undertake as experts to perform personal skilled services and who, either because they do not possess the skill they claim, or because of negligence, fail to perform in the manner and with the results that would attend performance with due care by a person of ordinary skill, may be sued either for breach of contract or for negligence, or where there is actual or constructive fraud, for such fraud. And where the action is ex delicto, exemplary damages may be recovered upon a showing of fraud even though the tort incidentally involves a breach of contract (Civ. Code, § 3294; *Chelini* v. *Nieri* (1948), 32 Cal.2d 480, 486 [196 P.2d 915]; *Haigler* v. *Donnelly* (1941), 18 Cal.2d 674, 680 [117 P.2d 331]). Furthermore, it is to be noted that Civil Code, section 3343, relied upon by the majority in the Bagdasarian case, expressly provides that ''Nothing herein [in § 3343] contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled.''

An attorney employed to examine the title to real property must exercise reasonable care and skill in the matter, and his failure to do so is negligence for which he will be liable to his client in damages for the loss occasioned. (5 Am.Jur. 338, § 132.) The measure of damages due from an attorney to his client for negligence in passing as clear a title encumbered with liens is the amount necessary to pay off the liens, and this is true regardless of whether the client later sells the property for a profit. The Supreme Court of New Jersey states the rule as follows (*Jacobsen* v. *Peterson* (1918), 91 N.J.L. 404 [103 A. 983, 984]): ''The question arises, What was the measure of damages? Where, as here, an attorney negligently omits to report the fact of a judgment, which is a lien upon real estate the title of which he was employed to investigate, and his client purchases such real estate in reliance upon such report and without knowledge of such judgment, the measure of damages is the amount his client is caused to pay out to remove the lien of such judgment. But it appeared that the plaintiff subsequently sold the real estate for a sum in excess of its total cost to him, including the discharge of the judgment, and the trial judge considered this justified the award of nominal damages only. Not so. The measure of damages was not affected by the sale. It will not do to say that in order for a client to recover for such negligence he must either sell the property at a loss or not

sell it at all. He was entitled to all the profit he would have made by the transaction if the title had been as represented.'' (See also Annotation, 5 A.L.R. 1389, 1394-1395, ''Liability of attorney passing defective title. . . . Measure of damages.'') Here, the condition of the land as to the fill was just as important to the plaintiffs as was its condition as to title; if they had been compelled to pay off a judgment lien of $3,093.65 they would have been no more out of pocket than they were by reason of having to pay the same sum for the deeper foundations required by the deeper fill.

The code does not require, and, as shown above, the case law does not suggest, that damages recoverable for deceit or negligence from one such as the defendant here who undertakes to perform personal skilled services be limited to the difference, if any, by which the market value of the land at the time of purchase is less than the price paid for it. Here the plaintiffs are actually out of pocket the entire $3,093.65 which they were required to pay over and above the basic contract price because defendant's representation was not true. Certainly to plaintiffs the amount of the detriment which they suffered as a result of defendant's wrong is the additional amount they were compelled to expend to obtain what both plaintiffs and defendant had contemplated they should obtain. I would, therefore, affirm the judgment.

SHENK, Acting C. J.—I dissent. I would affirm the judgment on the ground that under the facts of this case the detriment suffered by the plaintiffs is, as stated by Mr. Justice Schauer in his dissent, ''the additional amount they were compelled to expend to obtain what both plaintiffs and defendant had contemplated they should obtain.''

Respondents' petition for a rehearing was denied November 17, 1954. Shenk, J., and Schauer, J., were of the opinion that the petition should be granted.