Filed 1/27/22  Kiupelian v. Gemayel CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ARA KIUPELIAN et al., | B309826 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 19STCV21444) |
| v. | |
| GEORGE GEMAYEL et al. | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Holly J. Fujie, Judge.  Affirmed.

James A. Shalvoy for Plaintiffs and Appellants.

K&L Law Group and Marc Lazo for Defendants and Respondents.

\* \* \* \* \* \*

Two investors bought shares of "penny stock" in a company based on the representation that the stock's value would increase by up to 75,000 percent. Despite quickly learning that this representation was bogus, the investors waited more than four years to sue for intentional and negligent misrepresentation. After reviewing multiple iterations of a complaint that were internally inconsistent or inconsistent with one another, and after entertaining multiple demurrers resting on some arguments that were legally specious or that misrepresented the record, the trial court ultimately sustained a demurrer to the investors' operative complaint without leave to amend on the ground that the action was time barred. This was correct, so we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.     Facts

In January or March of 2015, Ara and Vardan Kiupelian (plaintiffs) bought stock in a company called Greenkraft, Inc. (Greenkraft) at a price of $.02 to $.28 per share. They bought $71,000's worth.

Plaintiffs bought this stock based on the representations of George Gemayel (Gemayel), who was Greenkraft's founder, president, CEO, and sole director. Specifically, Gemayel told them that (1) Greenkraft was a "manufacturer of alternative fuel engine products," (2) Greenkraft was a "viable, growing business," (3) there was "lots of demand" for Greenkraft's products, (4) "lots of people" had already invested in Greenkraft, and (5) Greenkraft's stock would increase in value to $13 to $15

per share (that is, that the stock's value would increase by somewhere between 4,642 and 75,000 percent).

Gemayel's representations to plaintiffs were not true: Greenkraft was never a "viable, growing business"; there was not "lots of demand" for its products; it had only 94 shareholders, which in plaintiffs' view is not "lots of people"; and its stock price never exceeded $1 to $3 per share (and between 2016 and 2018, never exceeded $.50 per share).

Plaintiffs began to suspect something was amiss just a few months after they first purchased Greenkraft's stock. Although some of their calls to Gemayel went unanswered, plaintiffs successfully reached and confronted Gemayel several times. In June 2015, they shared their concern that the stock price was "nowhere near" the promised price and that they intended to sell their stock; Gemayel urged them not to sell because the stock price *would* go up because (1) "lots of companies" wanted to buy Greenkraft's alternative fuel products, and (2) orders for those products "were going to be coming in." Eight months after that, in February 2016, plaintiffs again confronted Gemayel regarding why their Greenkraft stock was worth less than $1 per share. Gemayel gave them a similar line—namely, that they should keep their stock because its price would go up because "lots of orders" were coming in. Nine months after that, in November 2016, plaintiffs once again confronted Gemayel, who once again urged them not to sell their stock because its price would go up because Greenkraft's "business prospects were good" due to "a lot of demand" for its products and the recent hiring of a "new marketing advisor." And five months after that, in April 2017, plaintiffs had a face-to-face meeting with Gemayel at Greenkraft's "factory"; Gemayel once again advised plaintiffs to

"have patience" and not to sell their stock because the stock price would go up in light of "a lot" of orders coming in.

Plaintiffs did not subjectively learn that Gemayel's representations were untrue until October 2018.

## II. Procedural Background

### A. *Original complaint*

On June 14, 2019,[1] plaintiffs sued Greenkraft and Gemayel (collectively, defendants) for (1) intentional misrepresentation, and (2) negligent misrepresentation.[2] The complaint alleged that plaintiffs bought their Greenkraft stock (and were financially injured) in March 2015, and that Greenkraft was not a "viable,

---

[1] The third party vendor plaintiffs hired to electronically file their complaint accidentally filed this complaint twice, and plaintiffs subsequently dismissed the second, erroneously filed complaint with prejudice and sought a refund of the filing fee. Defendants argue that plaintiffs' dismissal of the second complaint constitutes a "retraxit" that bars plaintiffs' lawsuit entirely. We reject this argument as specious. Although the common law doctrine of retraxit bars a party from proceeding on a lawsuit if she has voluntarily dismissed an earlier iteration of that suit with prejudice (e.g., *Kronkright v. Gardner* (1973) 31 Cal.App.3d 214, 218-219), no case has applied the doctrine to a dismissal aimed at eliminating an accidental duplicative filing made by a third party vendor, and for good reason—extending the rule of automatic dismissal to this context would be a windfall to defendants and would be illogical, unjust, and unfair to the plaintiffs.

[2] Although plaintiffs alleged a "negligence" claim, the substance of the allegations underlying that claim indicate a claim for negligent misrepresentation. (*Saunders v. Cariss* (1990) 224 Cal.App.3d 905, 908 [court may disregard erroneous labels and look to facts alleged when ruling on demurrer].)

4

growing business" because its "managers and auditors" believe that Greenkraft's "financial survival depends on" (1) developing new customers, (2) "reclassifying company debt as 'non-current liability,'" and (3) "selling additional Greenkraft stock."

Defendants demurred to the complaint and filed a motion to strike. In those filings, defendants argued that plaintiffs' claims were barred by the statute of limitations. Plaintiffs filed a first amended complaint before the trial court could rule on the pending motions.

## B. *First amended complaint*

On October 17, 2019, plaintiffs filed a first amended complaint. Although this complaint alleged the same two causes of action, the allegations were different in three ways pertinent to this appeal. First, plaintiffs changed the date of their stock purchases. Instead of alleging that they were defrauded when they bought all of the stock (and suffered financial injury) in March 2015, plaintiffs now alleged that they were defrauded starting in January 2015 when they first bought their stock (and suffered financial injury) and continued to buy stock through September 2017. Second, plaintiffs changed the reason why Greenkraft was not a "viable business." Instead of alleging that Greenkraft was being mismanaged for not getting new customers, not reclassifying debt, and not selling more stock, plaintiffs now alleged that Greenkraft "never has been[] a real, viable business" because "[i]t has no product, manufacturing capability, inventory, employees, or customers." Third, and ostensibly in response to defendants' demurrer to the original complaint, plaintiffs for the first time alleged that they "did not discover" that Gemayel's representations were untrue until October 2018, and "could not have discovered [the] same through

5

the exercise of reasonable diligence" because Gemayel did not take all of their calls and "issu[ed] false and misleading public statements about Greenkraft's business, business operations, and financial condition."

Defendants demurred to and filed a motion to strike the first amended complaint. Among the six grounds asserted in these filings, defendants argued that plaintiffs' complaint was time-barred, that plaintiffs lacked standing, that the complaint was uncertain, and that it failed to allege facts sufficient to state any cause of action. After a full round of briefing and a hearing, the trial court sustained the demurrer and granted the motion to strike, both with leave to amend. Specifically, the court sustained the demurrer to the intentional misrepresentation claim because plaintiffs did not "indicate by what means [Gemayel's] representations were made" or "why [p]laintiffs relied on such alleged misrepresentations"; the court sustained the demurrer to the negligent misrepresentation claim because plaintiffs did not plead a breach of duty.

C.    *Second amended complaint*

On February 28, 2020, plaintiffs filed a second amended complaint. This complaint alleged the same two causes of action, but ostensibly in response to defendants' prior argument that plaintiffs lacked standing, plaintiffs alleged that Gemayel's misrepresentations not only induced them to *buy* Greenkraft stock, but also induced them *not to sell* the stock they previously purchased.

Defendants again demurred and filed a motion to strike this iteration of the complaint on the same six grounds as before. After a full round of briefing and a hearing, the trial court sustained the demurrer and granted the motion to strike; this

6

time, however, the court did so without leave to amend.[3] Specifically, the court ruled that plaintiffs' claims were time barred. Those claims accrued in January 2015 and plaintiffs' discovery of Gemayel's misrepresentations was delayed—at the latest—until February 2016, rendering their June 2019 original complaint outside the three-year statute of limitations for intentional misrepresentation and two-year statute of limitations for negligent misrepresentation. The court reasoned that plaintiffs "had a factual basis to [suspect] some wrongdoing by February of 2016" "given the repeated instances of the Greenkraft stock price trading well below its expected value despite Gemayel's representations that the stock price would go up" and that orders for Greenkraft products would come in.

Following entry of judgment, plaintiffs filed this timely appeal.

## DISCUSSION

A plaintiff has three years to file a claim for intentional misrepresentation and two years to file a claim for negligent misrepresentation. (Code Civ. Proc., §§ 338, subd. (d), 339, subd. (1).) Plaintiffs do not dispute that their June 2019 original complaint was filed outside those limitations periods if the accrual date for their claims is keyed to the date that they first

---

[3]     The trial court's minute order on one occasion referred to the sustention of the demurrer as being "with leave to amend," but the court subsequently issued a nunc pro tunc order correcting that typo. From this typo and one other in the minute order, plaintiffs extrapolate that the trial court mistakenly "conflated" its analysis of why the first and second amended complaints were defective. This argument is without merit, as the court's reasoning underlying its two demurrer rulings is different.

7

purchased the worthless Greenkraft stock in January 2015. However, plaintiffs urge that the trial court erred in dismissing their claims because (1) the so-called "delayed discovery rule" postponed the accrual of their claims until October 2018, which would make their claims timely, and (2) the court should have given them a third opportunity to amend their complaint.

## I.     The Law

### A.     *Regarding demurrers, generally*

In assessing whether a demurrer was properly sustained, we independently ask "'whether the [operative] complaint states facts sufficient to constitute a cause of action.'" (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100 (*Loeffler*), quoting *City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865; see also *Lee v. Hanley* (2015) 61 Cal.4th 1225, 1230 [de novo review].)  In answering this question, we "'assume the truth of the complaint's properly pleaded or implied factual allegations.'" (*Loeffler*, at p. 1100, quoting *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)  We will also take judicial notice of harmful allegations from prior iterations of a complaint and disregard new and contrary allegations.  (*Smyth v. Berman* (2019) 31 Cal.App.5th 183, 195 (*Smyth*).)  A complaint will be deemed to fail to state facts sufficient to constitute a cause of action when it shows, on its face, that the cause of action sought to be alleged is barred by the applicable statute of limitations.  (*County of Los Angeles v. Commission on State Mandates* (2007) 150 Cal.App.4th 898, 912; *Doe v. Roman Catholic Archbishop of Los Angeles* (2016) 247 Cal.App.4th 953, 960.)  In assessing whether leave to amend was properly denied, we review for an abuse of discretion by asking "'whether there is a reasonable possibility that the defect can be cured by amendment.'" (*Loeffler*, at p. 1100.)

**B.** *Regarding the delayed discovery rule*

The statute of limitations governing a particular cause of action begins to run when that cause of action accrues. (Code Civ. Proc., § 312; *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806 (*Fox*); *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 (*Norgart*).) "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all its elements.'"[4] (*Fox*, at p. 806; *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.) An exception to this general rule for defining the accrual of a cause of action is the delayed discovery rule. (*Norgart*, at p. 397.)

The delayed discovery rule postpones the accrual of a claim (and hence the running of the applicable limitations period) until the earlier of when the ""'plaintiff either (1) actually discovered his injury and its . . . cause or (2) could have discovered [the] injury and cause through the exercise of reasonable diligence . . . .' [Citation.]'" (*CAMSI IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525, 1536, italics omitted.) Under the latter prong, the limitations period will begin to run once the facts available to the plaintiff would cause a reasonable person to suspect that he has been injured and that his injury was due to someone's wrongful conduct. (*Nguyen v. Western Digital Corp.* (2014) 229 Cal.App.4th 1522, 1551 (*Nguyen*); *Fox, supra*, 35 Cal.4th at p. 807

---

[4] The elements of intentional misrepresentation are (1) misrepresentation, (2) knowledge of falsity (or "scienter"), (3) intent to defraud, (4) justifiable reliance, and (5) resulting damage. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) The tort of negligent misrepresentation has the same elements except the second and third, which are keyed to negligent rather than intentional conduct. (*Gagne v. Bertran* (1954) 43 Cal.2d 481, 487-488; Civ. Code, § 1710.)

["look[ing] to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them"].)  Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, he must decide whether to file suit or sit on his rights; so long as a suspicion exists, "the plaintiff must go find the facts; [he] cannot wait for the facts to find [him]." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1111 (*Jolly*).)  Therefore, the limitations clock will start ticking even if the plaintiff does not know "'the specific "facts" necessary to establish [his potential] claim'" (*Nguyen*, at p. 1551) or the full extent of his injury (*Miller v. Lakeside Village Condominium Assn.* (1991) 1 Cal.App.4th 1611, 1623), and even if the plaintiff has not investigated his suspicion (*Landale-Cameron Court, Inc. v. Ahonen* (2007) 155 Cal.App.4th 1401, 1408).  Once the plaintiff has "'"notice or information of circumstances to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation,"'"" he is charged with presumptive knowledge so as to trigger the limitations period.  (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 980 (*Shamsian*).)

To invoke the "delayed discovery" rule, a plaintiff must plead facts sufficient to convince the trial judge that delayed discovery was justified.  (*William L. Lyon & Associates, Inc. v. Superior Court* (2012) 204 Cal.App.4th 1294, 1310.)  Specifically, the plaintiff must plead (1) the time and manner of discovery; and (2) "'the inability to have made earlier discovery despite reasonable diligence.'"  (*Fox*, *supra*, 35 Cal.4th at pp. 808-809.)  Where, as here, a plaintiff alleges that his discovery of a wrong was delayed by the defendant's further misrepresentations aimed at concealing the wrongdoing, the applicability of the delayed

10

discovery rule turns on whether the plaintiff's reliance on those dissembling representations was reasonable. (*Grisham v. Philip Morris, U.S.A., Inc.* (2007) 40 Cal.4th 623, 637 (*Grisham*).)

## II.   Analysis

### A.   *Plaintiffs' claims are time barred*

Based on the facts alleged in the operative complaint, the trial court correctly determined as a matter of law that plaintiffs' discovery of defendants' wrongdoing was delayed, at most, until February 2016 (which renders plaintiffs' claims filed in June 2019 untimely). That is because a reasonable person in plaintiffs' situation would have suspected, by February 2016, that he had been injured and that his injury was due to someone's wrongful conduct. (*Fox*, *supra*, 35 Cal.4th at p. 807.) Indeed, plaintiffs alleged in the operative complaint that they suspected injury and wrongdoing as early as June 2015, when they confronted Gemayel about why the value of their stock was nowhere near the $13 to $15 per-share price Gemayel had promised. Although in June 2015 a reasonable person in plaintiffs' position may not have realized that the low stock price was due to someone's "wrongful conduct," that light bulb would have gone off in a reasonable person's mind by February 2016, when Gemayel made the same excuses and same empty promises about the status of Greenkraft and the soon-to-be-rocketing value of its stock as he did in June 2015. These excuses and promises would have rung particularly hollow in February 2016 given that, as plaintiffs allege, Gemayel had ignored several other attempts to contact him. (Cf. *Kitzig v. Nordquist* (2000) 81 Cal.App.4th 1384, 1391-1393 [discovery of wrongdoing may be delayed when a neutral third party giving a "second opinion" says there was no wrongdoing]; *Rosas v. BASF Corp.* (2015) 236 Cal.App.4th 1378,

11

1395-1396 [same].) In other words, a reasonable person might not suspect wrongdoing when a promised check does not arrive, or even when the sender assures "the check is in the mail" the first time; but by the second time the sender blithely assures "the check is in the mail," no reasonable person would accept the sender at his word. Because, by February 2016, plaintiffs had """"notice or information of circumstances to put a reasonable person on inquiry"""" that they had been wronged, plaintiffs are charged with presumptive knowledge and the limitations clock began to tick. (*Shamsian*, *supra*, 107 Cal.App.4th at p. 980.)

Plaintiffs make what boil down to three arguments in response.

First, plaintiffs contend that the question of whether a reasonable person would have suspected wrongdoing is *usually* a question of fact inappropriate for resolution on demurrer. (Accord, *E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1320 (*E-Fab*); *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 597.) But it is not *inevitably* a question of fact, and may be resolved as a question of law on demurrer where "reasonable minds can draw only one conclusion" from the allegations in the operative complaint. (*E-Fab*, at p. 1320; *Jolly*, *supra*, 44 Cal.3d at p. 1112.) Here, we conclude, as a matter of law, that a reasonable person in plaintiffs' situation would have suspected wrongdoing by February 2016 given plaintiffs' admitted suspicion of wrongdoing along with Gemayel's conduct in ignoring their calls, and when he was unable to ignore them, feeding plaintiffs the same vague lines about "orders coming in."

Second, plaintiffs urge that the trial court was "completely arbitrary" in saying that a reasonable person should have been

12

aware of wrongdoing in 13 months because Gemayel did not promise any particular time frame by which the Greenkraft stock they bought would reach $13 to $15 per share. This argument misses the point. What put plaintiffs on constructive notice of their claims against defendants was not the mere passage of 13 months; the trial court focused on February 2016 because, by that time, plaintiffs affirmatively alleged that they suspected wrongdoing and had gone to Gemayel *twice* with their concerns. By the time Gemayel effectively told them "Trust me" the second time after his first assurance changed nothing, plaintiffs were charged with constructive notice. By alleging all of the subsequent times Gemayel effectively told them, "Trust me" even after February 2016, plaintiffs seem to suggest that a reasonable person would accept a suspected fraudster's assurances that "everything is okay" ad infinitum. We reject this suggestion. Plaintiffs' interpretation of the delayed discovery rule would allow for open-ended extensions of the statutes of limitation in derogation of the policy behind them—that is, to give wronged persons the incentive to reasonably and diligently investigate and sue for wrongs. (See *Fox*, *supra*, 35 Cal.4th at p. 807-808.)

Lastly, plaintiffs assert that their discovery of defendants' wrongdoing was postponed by Gemayel's later assurances that "orders were coming in." We reject this assertion. Although a plaintiff's reliance on a defendant's representations aimed at concealing his wrongdoing can sometimes justify delayed discovery, it only does so when the plaintiff's reliance is reasonable. (*Grisham*, *supra*, 40 Cal.4th at p. 637.) Here, plaintiffs' reliance on Gemayel's repeated representations that Greenkraft was a booming business was *not* reasonable in light of the flatlining stock price, Gemayel's evasion of their calls, and

13

how Gemayel's June 2015 assurance had proven itself meaningless by February 2016. Plaintiffs add that they were unable to investigate any wrongdoing because Gemayel solely controlled Greenkraft. This is incorrect both legally and factually. It is incorrect legally because the delayed discovery rule does not postpone accrual just because a potential plaintiff does not have "the specific 'facts' necessary" to bring his claim; as courts have noted time and again, that is what the pretrial discovery process is for. (*Jolly*, 44 Cal.3d at p. 1111.) It is incorrect factually because plaintiffs *did* have the opportunity to obtain more information: They admit in their operative complaint that they visited Greenkraft's "factory" and there is nothing to suggest they could not have examined Greenkraft's public filings to get a sense of its ongoing operations (or lack thereof).[5]

---

[5] Although plaintiffs do not make this argument, we reject any notion that their purchase of Greenkraft stock until September 2017—which they allege in the first and second amended complaints—means that were harmed less than two or three years before they filed suit in June 2019. Any claim of injury within the limitations period is foreclosed by prior iterations of their complaint. That is because plaintiffs alleged in the original complaint that they suffered $71,000 in damages from purchasing Greenkraft stock in March 2015, and alleged in subsequent complaints that they suffered the exact same amount of damages from purchases running from January 2015 to September 2017. Because plaintiffs are bound by their prior allegations, they cannot make a factually inconsistent allegation in order to fit within the limitations period. (*Smyth, supra*, 31 Cal.App.5th at p. 195.)

**B.** *The trial court properly denied leave to amend*

The trial court also did not err in denying plaintiffs leave to amend because there is no reasonable possibility that the untimeliness of their lawsuit could be cured by amendment. (*Loeffler*, *supra*, 58 Cal.4th at p. 1100.) Because we have concluded as a matter of law that a reasonable person in plaintiffs' position would have been on notice of suspected wrongdoing and the source of the injury by the second time Gemayal gave them the same excuses in February 2016, nothing plaintiffs can allege factually in a future complaint can cure that defect.

Plaintiffs respond with three arguments.

First, plaintiffs suggest that the trial court was wrong to state that they had already had two opportunities to fix mistakes with their complaint when, in reality, they had only had one opportunity. This is so, plaintiffs assert, because they filed their first amended complaint *before* the trial court could rule on defendants' pending demurrer to and motion to strike their original complaint. This is disingenuous. Plaintiffs did not write or file their first amended complaint until after they had received defendants' filings, and the first amended complaint responded to some of the challenges raised in those filings. That plaintiffs filed the first amended complaint before the trial court could rule on the pending attacks to the pleadings does not somehow mean that plaintiffs had no opportunity to respond to those attacks.

Second, plaintiffs argue that they are entitled to a further opportunity to amend their complaint to address the statute of limitations defect because the trial court's earlier order sustaining the demurrer to the first amended complaint rested on a different ground. According to plaintiffs, a plaintiff should

15

always be given at least one opportunity to fix a defect in a pleading *after* a trial court has dismissed the pleading on the basis of that defect.  This is not the law.  Nor should it be in a case like this, where nothing plaintiffs could plead could cure the defect justifying dismissal.

Third, plaintiffs contend that they are able to plead additional facts about how they learned of defendants' wrongdoing in October 2018.  This is irrelevant.  Whether plaintiffs can allege further facts to support when they acquired *actual* knowledge of defendants' malfeasance has no bearing on our conclusion as to when they are charged with *constructive* knowledge.

*       *       *

In light of our analysis, we have no occasion to reach defendants' alternative arguments in favor of affirming the trial court's demurrer ruling.

## DISPOSITION

The judgment is affirmed.  Each party is to bear its own costs on appeal.[6]

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

We concur:                                    HOFFSTADT


_____, P. J.

LUI


_____, J.

ASHMANN-GERST

---

[6]     The poor judgment exhibited by defendants' counsel on appeal did not go unnoticed.   Defendants' brief starts with a recitation that plaintiffs are "sophisticated stock investors" who "often invested in small start-up penny stock companies and then sued those companies in a shake down fashion forcing a settlement amount."  These "facts" are nowhere in any of plaintiffs' complaints and are certainly not subject to judicial notice; as such, they have no place in an appeal reviewing the sustaining of a demurrer.  What is more, they appear to be nothing more than an ad hominem attack unsupported by the record.  This tactic, coupled with defendants' pursuit of the altogether specious assertion that plaintiffs' claims are barred because they cured their vendor's error by dismissing the accidentally filed duplicate complaint, justifies the equal imposition of costs in this case.  (Cal. Rules of Court, rule 8.278(a)(5).)